(609 P.2d 1157)

No. 51,378
No. 51,379
No. 51,589
No. 51,595

THE GAS SERVICE COMPANY; MIDWEST GAS USERS ASSOCIATION and SEYMOUR FOODS, INC., *Appellants,* v. THE STATE CORPORATION COMMISSION OF THE STATE OF KANSAS; G. T. VANBEBBER, RICHARD C. LOUX, and WILLIAM G. GRAY, as Members of Said Corporation and their Respective Successors in Office, *Appellees.*

Petition for review denied July 15, 1980.

Opinion filed April 18, 1980.

*W. H. Bates* and *Stuart W. Conrad,* of Lathrop, Koontz, Righter, Clagett, Parker

& Norquist, of Kansas City, Missouri, and *Thomas L. Theis,* of Sloan, Listrom, Eisenbarth, Sloan & Glassman, of Topeka, for appellants Midwest Gas Users Association and Seymour Foods, Inc.

*Richard C. Byrd* and *Walker A. Hendrix,* of Anderson, Byrd & Richeson, of Ottawa, and *Donal D. Guffey,* of The Gas Service Company, of Kansas City, Missouri, for appellant The Gas Service Company.

*Terence L. Mundorf* and *Elizabeth R. Herbert,* assistants general counsel, for appellees.

Before FOTH, C.J., ABBOTT and PARKS, JJ.

ABBOTT, J.: Four separate requests for judicial review have been consolidated in this case. All of the requests involve State Corporation Commission Docket No. 115,485-U.

The Gas Service Company is a public utility authorized to transact business in Kansas as a foreign corporation. It is engaged in the distribution and sale of natural gas for domestic, commercial and industrial uses. On June 23, 1978, it filed an application with the State Corporation Commission (Commission) for a rate increase to customers in Kansas which, based upon a test year ending June 30, 1978, would produce an additional $12,603,724.

Midwest Gas Users Association (Midwest) and Seymour Foods, Inc., (Seymour) filed a petition to intervene. Midwest is an unincorporated, nonprofit association of some 155 business concerns and corporations which are substantial users of natural gas in Kansas, Missouri and Oklahoma. Seymour operates a large processing plant in Topeka, Kansas, and is an industrial customer of Gas Service. The Commission found that Midwest and Seymour have interests adequate to warrant their participation and granted them leave to intervene.

Hearings were completed on January 23, 1979, and the matter was taken under advisement. On March 16, 1979, the Commission announced to the press that it was granting a rate of return that would produce an additional $960,574. On July 5, 1979, an order confirming the original announcement of March 16, 1979, was mailed to the parties by the Commission. The order does not contain sufficient findings to permit meaningful review, and it obviously was not intended to do so. The order recited in part: "The Commission shall issue a subsequent order in this proceeding which shall make additional findings consistent with this order." The order further mandated Gas Service to file tariffs within thirty days in accordance therewith. The Commission did not allow Gas Service to collect the additional revenue until after its first order was mailed on July 5, 1979. The increase was put

into effect when tariffs were filed with the Commission on July 9, 1979.

Applications for rehearing were filed on July 16, 1979, by Gas Service, General Motors (no longer a party), Midwest and Seymour in accordance with K.S.A. 1979 Supp. 66-118b. The matters were set for oral argument and on August 20, 1979, the Commission denied the requests for rehearing. On the same date, the Commission mailed its second or "final" order (also reciting the date of March 16, 1979), wherein it made findings of fact and conclusions of law regarding its previous order.

Applications for rehearing were thereafter filed by Gas Service, Midwest, Seymour and General Motors. Oral argument was held and the Commission denied the requests for rehearing. In the interim, Gas Service, Midwest and Seymour timely filed their applications for judicial review to this Court.

Gas Service, Midwest and Seymour take the position that all proceedings taken by the Commission after its statutory denial of their applications for rehearing on the first order were null and void; and that the first order is unlawful and unreasonable because it fails to contain findings of basic facts as required by law. We have no hesitancy in saying the first order upon which the Commission acted does not contain a concise and specific statement of the relevant law and basic facts. *Securities Comm'n v. Chenery Corp.,* 318 U.S. 80, 87 L.Ed. 626, 63 S.Ct. 454 (1943); *Cities Service Gas Co. v. State Corporation Commission,* 201 Kan. 223, 440 P.2d 660 (1968); *Kansas Public Service Co. v. State Corporation Commission,* 199 Kan. 736, 743, 433 P.2d 572 (1967); K.A.R. 82-1-232(a)(3). The Commission does not contend otherwise. Its position is that the first order is an interim one and that the Commission's statement, "The instant order is a final order of the Commission insofar as it grants rate relief to Applicant in the amount of $960,574.00 and adopts the rate design proposed by Applicant in this proceeding," was intended to let the litigants know that the amount of rate increase and rate design would not be changed in the final order. Applicant and intervenors argue that the first order is called a final order by the Commission, is a final order, and therefore procedurally it became a final order before the second order was issued and thus the Commission had no jurisdiction to issue the second order.

We agree with the Commission that the first order was a lawful

and reasonable *interim* order, issued under the authority of K.A.R. 82-1-232(c) and designed to fill the gap between the times the decision was rendered and the full order could be issued. The Commission recognized that its first order was inadequate as evidenced by the statement that a subsequent order containing additional findings would be issued. Having issued an interim order, the Commission had jurisdiction to issue its second and final order.

In any event, there appears to be no useful purpose in holding the first order void solely because the findings are inadequate. The appropriate remedy for inadequate findings is to remand the case for additional findings of fact and conclusions of law. *Cities Service Gas Co. v. State Corporation Commission,* 201 Kan. at 238; see also K.S.A. 60-252(*a*), and *In re Atwood,* 2 Kan. App. 2d 680, 681, 587 P.2d 1 (1978). Since the Commission has already issued a full order, the remedy of remanding the case solely for inadequate findings becomes a useless act and meaningless, as the Commission would obviously adopt as its findings those contained in the second order. We need not ascertain whether we have authority to retain jurisdiction while remanding for additional findings of fact, or what the effect would be if we reversed and remanded without retaining jurisdiction, as we are of the opinion the first order was an interim order.

An interim order becomes moot when superseded by a final order fixing permanent rates. *Six Cities v. State Corporation Commission,* 213 Kan. 413, 516 P.2d 596 (1973); *Midwest Gas Users Ass'n v. Kansas Corporation Commission,* 3 Kan. App. 2d 376, 595 P.2d 735, *rev. denied* September 11, 1979. Thus, the question raised as to the adequacy of the findings will be determined on the basis of the findings in the second and final order.

An administrative agency's decision must express basic facts on which it relies with sufficient specificity to convey to the parties, as well as to the courts, an adequate statement of the facts which persuaded that agency to arrive at its decision. *Blue Cross & Blue Shield v. Bell,* 227 Kan. 426, Syl. ¶ 1, 607 P.2d 498 (1980); *Kansas Public Service Co. v. State Corporation Commission,* 199 Kan. at 745. The Commission could have expressed its rationale in more detail in some instances, a statement that can be and usually is made in nearly every case considering the adequacy of findings. Our review of the record before us indicates adequate

although not exceptional compliance with K.S.A. 60-252(*a*) and K.A.R. 82-1-232(a)(3). *Cities Service Gas Co. v. State Corporation Commission,* 201 Kan. at 230-32.

Before turning to Gas Service's remaining six issues with multiple subheadings, we dispose of the two remaining contentions of Midwest and Seymour that the Commission erred in refusing to permit them to cross-examine the Commission's witness, economist John C. Dunn, on the issue of relative risk of customer classes, and in excluding evidence which they contend tended to show that there was not a natural gas supply shortage.

An objection was sustained to cross-examination of the Commission's witness Dunn on the basis it was beyond the scope of the direct examination. Midwest and Seymour also contend Dunn was not made available at a later date for cross-examination. Generally, cross-examination is limited to the scope of direct examination. The trier of facts is vested with considerable discretion in determining the proper scope of cross-examination and, absent a showing of an abuse of that discretion, the trier's rulings with respect thereto will not be disturbed on appeal. *State v. Watkins,* 219 Kan. 81, 86, 547 P.2d 810 (1976); *Frame, Administrator v. Bauman,* 202 Kan. 461, Syl. ¶ 1, 449 P.2d 525 (1969).

The general tenor of Dunn's testimony relates to rate *base* issues, but the desired cross-examination of him related to rate *design* issues—specifically, relative risk factors. Although certain portions of his testimony relate to the risk issue, it appears that the Commission's ruling was proper considering the primary emphasis of Dunn's testimony and the Commission's substantial interest and its discretion in proceeding with an orderly discussion of the issues. Midwest's assertion that it was unable to call Dunn as a witness is not supported by the record. K.A.R. 82-1-230(c) provides that a party may call an adverse witness and this right is fortified by the right of subpoena under K.A.R. 82-1-227(a). The record does not show that Midwest attempted to utilize the appropriate provisions, but instead relied on its argument that it was entitled to cross-examine Dunn. Under these circumstances, the Commission's rulings as to Dunn appear to be something less than an abuse of discretion.

Midwest and Seymour offered exhibits 47 and 48 during their examination of Stanley Whiteaker, CPA, but they were excluded on the basis that they were hearsay, cumulative and irrelevant.

Exhibit No. 47 is a statement that J. Richard Jones, a Cities Service Gas employee, made to a legislative committee. The statement is hearsay and was excluded as such. No viable argument was made to the Commission as to why exhibit No. 47 should not be excluded as hearsay, and the Commission did not err in excluding it. Exhibit No. 48 is a statement that James Stuck, an employee of Gas Service Company, apparently gave to the Federal Energy Regulatory Commission. Midwest and Seymour interpret the statement as a declaration against interest by Stuck while acting in his capacity as an authorized agent of Gas Service Company; the interpretation is to the effect that there is no gas shortage in the United States. Our reading of the excluded statement does not convince us it is an admission against interest. As we view the statement, it does not affirmatively state there is no gas shortage. It does describe where Gas Service and its suppliers are affected by various curtailment programs. We cannot say that Midwest and Seymour were prejudiced by the exclusion or that the Commission abused its discretion in excluding exhibit No. 48.

We turn now to the issues raised solely by Gas Service concerning three rate orders issued by the Commission. The standard of review is well established and need not be reiterated here, having recently been restated in *Midwest Gas Users Ass'n v. Kansas Corporation Commission,* 3 Kan. App. 2d at 380-81, and cited with approval in every rate case considered by this Court since its filing.

Gas Service argues that the Commission arbitrarily and erroneously adhered to a rigid test year concept and excluded certain evidence from consideration. The Commission replies that a test year is authorized by K.A.R. 82-1-231(c) and that the Commission has the discretion to utilize out-of-period information to make appropriate adjustments. The Commission does insist when an applicant requests that out-of-period adjustments be considered that both benefit and detriment be considered. As we view the record, the Commission appears to have considerable reluctance in accepting out-of-period adjustments, but it does not have a hard and fast rule against them. The Commission does consider out-of-period adjustments which are likely to significantly and/or permanently affect rates. If the Commission accepted all offered out-of-period adjustments, the concept of the test year would be a

nullity. We cannot say the Commission adheres to a rigid test year concept which results in its arbitrarily excluding evidence. Specific complaints concerning the Commission's refusal to make out-of-period adjustments follow.

Gas Service complains that the Commission should not have reduced its proposed rate base by $614,220. The reduction is for construction work in progress (CWIP) that was substantially complete (80 percent or more) during the test year, but not operational at the end of the test year. The projects were in service at the time of the rate hearing. The Commission found that the projects were not used or required to be used to provide services to ratepayers and did not include them in the rate base for the test year.

The Commission also excluded minor CWIP (construction work in progress with an expense of less than $1,000) from the rate base, stating:

"The Commission finds that the inclusion of minor construction work in progress in rate base is violative of the principle that only the property of the utility used or required to be used to provide service to the customers should be included in rate base. We agree with Staff that Applicant has the option of capitalizing AFUDC [allowance for funds used during construction] on minor construction work in progress. Accordingly, we find that Staff Adjustment No. 6 to rate base is appropriate and is hereby adopted."

The Commission is authorized to include CWIP that will be completed within one year or less of the test year by virtue of language added in 1978 to what is now K.S.A. 1979 Supp. 66-128, as follows:

"For the purposes of this act, property of any public utility which has not been completed and dedicated to commercial service shall not be deemed to be used or required to be used in said public utility's service to the public, except that, any property of a public utility, the construction of which will be completed in one (1) year or less, *may* be deemed to be completed and dedicated to commercial service." (Emphasis added.)

As we view the statute, it is not mandatory that the Commission include the cost of CWIP and our Supreme Court so indicated in language found in *Kansas City Power & Light Co. v. KCC,* 224 Kan. 86, 578 P.2d 254 (1978). The question was whether the statute, prior to addition of the portion quoted above, required or precluded inclusion of CWIP in the rate base. The Court held at page 88:

"It is the opinion of the court that under the statute, as then constituted, the

inclusion or exclusion of CWIP in the rate base was a discretionary function of the Commission to be based upon a factual determination, from the evidence submitted, whether the requested CWIP was 'property . . . used or required to be used in its services to the public within the state of Kansas, . . .' (K.S.A. 66-128.) See *Kansas Gas & Electric Co. v. State Corporation Commission,* 218 Kan. 670, 544 P.2d 1396 (1976)."

The Court then commented on the 1978 addition, stating:

"House Bill 2070 attempts to clarify the legislative intent of 66-128 in that it specifically excludes all CWIP from consideration by the Commission except any CWIP which will be completed in one year or less *may* be included by the Commission in its determination of the rate base. The inclusion of CWIP continues to be a discretionary matter for the Commission only to the extent that it will be completed in one year or less." (at 89.)

In this case, neither the major nor minor CWIP was completed and in service at the end of the test year, but it was all completed at the time of the rate hearing and within six months after the end of the test year. Thus, by statute, inclusion of the CWIP was discretionary with the Commission, "based upon a factual determination, from the evidence submitted, whether the requested CWIP was 'property . . . used or required to be used in its services to the public within the state of Kansas.' "

As to major CWIP, Gas Service contends that the Commission acted "unlawfully and arbitrarily" by failing to make a factual determination as to whether the projects were used or required to be used, and further "unreasonably" excluded the projects when they *were* completed within one year of the end of the test year.

Although *Kansas Gas & Electric Co. v. State Corporation Commission,* 218 Kan. 670, 544 P.2d 1396 (1976), did not involve CWIP, the Supreme Court gave some indication of the meaning of "used or required to be used" by stating at 674:

"This is not to say that a unit or segment of a facility that has become obsolete or whose production is far in excess of present or near future needs, or for any valid reason, is not used or required to be used and can be setoff or separated from a facility otherwise used, cannot be excluded from rate base under the statute."

If the property is CWIP to be completed within one year and as a factual matter is not "in excess of present or near future needs" or is in some other way remote from the purpose of providing service to the public, it "may" be included in the rate base.

The Commission's factual determinations as to the major CWIP borders on being inadequate, and persuasive argument is made that the Commission appears to have excluded major CWIP

merely because the projects were not in service at the end of the test year. That rationale was advanced by the Commission and rejected by the Supreme Court in *Kansas City Power & Light Co. v. KCC,* 224 Kan. 86. The Commission in this case did present evidence that to include the major CWIP could cause a mismatch between revenue and expense and lead to a distortion in the rate setting process. Gas Service offered little evidence of why major CWIP should be included other than the fact the projects were completed within the test year. Given a liberal construction, the Commission order does find that the items were not used or required to be used at the end of the test year and were excluded due to a "loss of synchronization" between the rate base and operations. Although Gas Service complains of the use of "buzz" words such as "synchronization" and "annualization" in the testimony and findings, they appear to be nothing more than jargon that provides a means of communication within the industry. Obviously the Commission can consider both the benefit and detriment to a public utility by including CWIP in the rate base.

The Commission allows the utility to capitalize funds used during construction on all CWIP, a viable alternative to the inclusion of CWIP in rate base. C. Phillips, The Economics of Regulation, 252, 253 (rev. ed. 1968). Gas Service does capitalize major CWIP. As to minor CWIP, Gas Service argues that it is infeasible to capitalize interest on minor projects. The Commission found that capitalization of funds used during construction was available to Gas Service, and this finding was based on expert testimony. We would be substituting our judgment for that of the Commission if we were to hold its finding unreasonable, for the finding is based on substantial evidence. Based on the record before us, we cannot say the Commission was so far wide of the mark so as to be outside the realm of fair debate. *Graves Truck Line, Inc. v. State Corporation Commission,* 215 Kan. 565, 527 P.2d 1065 (1974).

Gas Service next argues that the Commission's decision to increase accumulated depreciation, amortization, and amortization for annualized depreciation expense is unlawful and unreasonable. The Commission, following past practice, held that if a public utility includes depreciation expenses in operations, the corresponding amount must be removed from the rate base to

prevent over-collection of authorized rates. Gas Service contends that the Commission's method would result in its never receiving a return on that portion of the plant that is annualized for expense, because it is eliminated from rate base before a return is earned. The Commission had before it conflicting testimony from apparently well-qualified witnesses. It adopted findings based on the expert testimony that the method it chose to adopt would prevent the Kansas ratepayers from paying the expense twice. The adjustment is supported by substantial competent evidence and does not result in confiscation of Gas Service's property.

We also find Gas Service's argument that the Commission deprived Gas Service of a return on working capital requirements to be without merit. Gas Service raises a number of areas it argues falls within this category.

Both the staff and Gas Service conducted lead-lag studies designed to calculate the cash working capital requirements. A lead-lag study reflects the lag in the number of days between the payment of operating expenses by Gas Service and the receipt of payment from customers for service rendered. A public utility may include an appropriate amount of working capital in the rate base in order that the utility's investors receive a return on required capital. Lag time differed substantially between the two studies. Gas Service used the actual receipt day for customer payments, and staff reasoned that Gas Service was compensated by charges for late payments and used either the date cash was received or the due date, whichever was earlier. Our Supreme Court has said that a public utility may include in the late payment charge a sum "to cover extension of credit" as well as a charge to defray the expense involved in securing payment of the bill. *Jones v. Kansas Gas and Electric Co.*, 222 Kan. 390, 565 P.2d 597 (1977). The cost of extending credit provides a return on the amount unavailable to the company to cover the cost of operations due to the late payment by the customer. The fact that the late charge is placed in operating revenue by Gas Service is immaterial. The Commission also used the due date on bills paid by the utility and did not recognize advance payments. To us, it is within the realm of fair debate whether ratepayers should be responsible for working capital requirements increased by voluntarily advancing payments, thus we cannot say the Commission's position is erroneous.

Gas Service argues that staff determined and the Commission found a lead time of 89.59 days for federal income taxes accrued. Gas Service argues the offset is unreasonable because no federal taxes are paid for which accruals will be available to meet its cash requirements. Tax accruals provide a positive source of cash for working capital and should prevent a utility from requiring customers to pay a return on funds already supplied by them in the form of prepaid taxes. *N.W. Pub. Serv. v. Cities of Chamberlain, Etc.,* _____ S.D. _____, 265 N.W.2d 867, 875 (1978); *Pacific Tel. & Tel. Co. v. Public Util. Com.,* 62 Cal. 2d 634, 44 Cal. Rptr. 1, 401 P.2d 353 (1965); *Ill. Bell Tel. Co. v. Comm. Com.,* 55 Ill. 2d 461, 303 N.E.2d 364 (1973); *Cincinnati v. P. U. C.,* 161 Ohio St. 395, 119 N.E.2d 619 (1954); *Cleveland Elec. Illuminating Co. v. Pub. Util. Comm.,* 42 Ohio St. 2d 403, 330 N.E.2d 1 (1975).

The Commission also excluded compensating bank balances from working capital. Gas Service takes the position that exclusion is unreasonable primarily because the utility must maintain such balances in order to obtain favorable interest rates and to keep its short-term credit open. Ten percent of the line of credit available is maintained in each of the banks for an average of $4,312,000. Other jurisdictions have disallowed rate base treatment of compensating bank balances. See *Boston Edison v. Dept. of Public Utilities,* _____ Mass. _____, 375 N.E.2d 305 (1978); *Re Missouri Public Service Co.,* 25 Pub. U. Rep. 4th 24 (Mo. 1978); *Re Iowa Pub. Service Co.,* 21 Pub. U. Rep. 4th 339 (S.D. 1977); *Re Otter Tail Power Co.,* 21 Pub. U. Rep. 4th 254 (S.D. 1977); *Re Montana-Dakota Utilities Co.,* 21 Pub. U. Rep. 4th 1 (Mont. 1977). As we construe the Commission's finding, it is to the effect that Gas Service has failed to sustain its burden of showing that a compensating balance is absolutely necessary to keep open a line of credit and that the cost of short-term credit should not be reflected in cash working capital requirements. From our review of the voluminous record we cannot say the Commission's decision is unreasonable, for it appears to be based on substantial competent evidence.

Gas Service's arguments concerning agents' working capital and the 45-day rule are without merit. Sufficient competent evidence is present in the record to support the Commission's exclusion of the agents' working funds from working capital. The

45-day rule that Gas Service complains of was not applied by the Commission in this case. The Commission used the rule as an additional yardstick by which to gauge the validity of the two conflicting lead-lag studies.

The Commission also increased Gas Service's operating revenues and operating expenses by eliminating Gas Service's one percent adjustment which had reduced customer usage in the general service category due to estimated decreases in usage. Gas Service presented opinion evidence that because of energy conservation implementation by ratepayers, total usages would be reduced by one percent. It did not present evidence of any studies made on which it based the opinion. On rebuttal, it attempted to introduce a study based upon *past* years' experience as opposed to *future* years. The evidence could have been admitted in Gas Service's case in chief. It is thus discretionary with the court whether it should be admitted on rebuttal. *Jacks v. Cloughley,* 203 Kan. 699, 457 P.2d 175 (1969). Although the study was not admitted into evidence, the statistics used in the study appear to have been largely introduced through witnesses and the gist of the study was before the court. As we view the Commission's findings, a prospective study was desired and it was not satisfied that the decline in usage was likely to continue. We cannot say the Commission abused its discretion or that its decision is arbitrary. We view Gas Service's complaint to be more in the nature of a request that we substitute our judgment for that of the Commission and hold that a one percent reduction can reasonably be expected. We are prohibited from substituting our judgment for that of the Commission.

Gas Service in its application equalized gas purchases and sales, and the Commission made an adjustment proposed by its staff to account for lost and unaccounted-for gas (excess of gas purchased over gas sold and represented generally by gas leaks and metering errors). Gas Service's witness testified that equalized gas purchases and sales are not actual situations. We cannot say the adjustment was unreasonable, particularly in view of the fact that Gas Service offered no rebuttal on this issue.

Several specific expense items requested by Gas Service were disallowed. A general rule regarding expenses is stated in *Mississippi River Fuel Corp. v. Federal Power Com'n,* 163 F.2d 433, 437 (D.C. Cir. 1947):

"Expenses (using that term in its broad sense to include not only operating expenses but depreciation and taxes) are facts. They are to be ascertained, not created, by the regulatory authorities. If properly incurred, they must be allowed as part of the composition of the rates. Otherwise, the so-called allowance of a return upon the investment, being an amount over and above expenses, would be a farce."

The Commission had previously ordered Gas Service to implement a customer or energy audit program. Based on this order, Gas Service requested an increase in operation expenses in the amount of $320,349 to reflect the costs of implementing such a program. Although no findings whatsoever were made by the Commission in this regard, both parties agree the Commission disallowed the request. The costs of the program were not refuted by the staff, although it contended such figures were speculative and relied on testimony from Gas Service witness Fink that the program had not been instituted and no expenses had been incurred even as of the date of the hearing. The staff argues the program "was not a known and determinable change occurring outside of the test year at a time certain."

The general rule is that the Commission may not arbitrarily disallow an actual, existing operating expense incurred during a test year. See *Application of Wilm. Suburban Water Corp.,* 58 Del. 494, 504, 211 A.2d 602 (1965). A corollary to the general rule is that claims for future expenses which are merely conjectural should not be allowed in rate proceedings. *Re Mountain States Teleph. & Teleg. Co.,* 14 Pub. U. Rep. 3rd 230, Syl. ¶ 8 (Wy. 1956). With respect to adjustments outside the test year, the following excerpts fairly summarize the applicable law:

"Although the use of a test year is proper, the Commission, in exercising its legislative function of fixing utility rates for the future, should not be blind to the future. It may adjust the results of the test year by allowing for *known changes* to make the test year representative of the future. . . ." *Commonwealth v. VEPCO,* 211 Va. 758, 771, 180 S.E.2d 675, 89 Pub. U. Rep. 3d 395 (1971) (emphasis added).

"Ratemaking, by its very nature, is prospective and in order to neutralize the negative effects of speculation and guesswork about future economic conditions, it is accepted practice to base future rates upon known past and present conditions through the use of data gathered during a specified test period. [Cite omitted.] This process of prognostication creates a conflict between the need to lend some finality to ratemaking by utilizing a well-defined, finite test period and the need to base calculations upon the latest available relevant data which often pertains to time periods other than the test period. [Cite omitted.] A satisfactory resolution of this conflict is that when *known and measurable* post-test-year changes affect with

certainty the test-year data, *the commission may, within, its sound* discretion, give effect to those changes. [Cite omitted.]" *Narragansett Elec. Co. v. Harsch,* 117 R.I. 395, 416, 368 A.2d 1194 (1977) (emphasis added).

In a rate proceeding, utility expenses, to be allowable, must be justified. *In re Board's Investigation of Tele. Cos.,* 66 N.J. 476, 333 A.2d 4, 8 Pub. U. Rep. 4th 36 (1975). In the present case, the justification for Gas Service's requested adjustment for the energy audit program appears to be quite strong in light of the fact that institution of the program was ordered by the Commission itself. However, the testimony is unequivocal that initiation of the program was to be at least six months outside of the test year and the expenses sought in relation thereto, though not controverted by staff, are nonetheless by definition conjectural. Under such circumstances, it appears that the Commission did not abuse its discretion, especially in light of testimony concerning the frequency of rate applications by Gas Service. Because of the uncertainty of the data offered by Gas Service due to the total lack of historical information, the Commission's decision to disallow the expense appears to be reasonable. In determining the legitimate expense of a utility for rate-making purposes, experience is the best criterion, and guesswork as to the future cannot be substituted for this experience. *Alabama Public Serv. Com'n v. Southern Bell T. & T. Co.,* 253 Ala. 1, 42 So. 2d 655, 84 Pub. U. Rep. NS 221 (1949). When actual information is available, either at the time of Gas Service's next rate application or during the interim, the Commission will be in a better position to assess the reasonableness and accuracy of this particular item.

Gas Service presented opinion evidence to the effect that as the number of customers served by Gas Service increases, the expenses associated therewith also increase and do so essentially in proportion to the net customer gain. Conflicting evidence is in the record. The theory underlying Gas Service's proposed increase (proportional increases between customers and expenses) is somewhat erroneous and has been so recognized in Pennsylvania, where their Commission reduced requested expenses, stating:

"Some operating expenses vary in an approximately constant ratio to the number of customers or the quantity of energy output. It is also apparent that other expenses, such as some administrative expenses, do not vary in proportion to energy sold or number of customers served." *Pub. Util. Comm. v. Metropolitan Edison Co.,* 13 Pub. U. Rep. 3d 29, 68-69 (Pa. 1956); *cf. Pennsylvania PUC v. Duquesne Light Co.,* 16 Pub. U. Rep. 4th 36, 55 (Pa. 1976).

Thus, we cannot say the Commission's reduction of the amount claimed by Gas Service was unreasonable or, in view of Mr. Elic's testimony, that it is unsupported by substantial competent evidence.

The Commission's decision concerning adjustments for retirement plan expenses and group insurance premium costs is supported by substantial competent evidence and is reasonable.

The Commission amortized the rate case expenses over a two-year period rather than a one-year period. The Commission's usual practice is to amortize rate case expenses over a period equal to the usual period of time between rate relief applications of the applicant. Gas Service argues it filed cases in December 1976, February 1978, June 1978, and June 1979, thus it should have been allowed the entire expense during the test year. A witness testified Gas Service filed rate cases in 1972, 1974 and 1976, and that the February 1978 case was merely an extension of the 1976 case. Of course, the June 1978 application is the one before us. Based on the evidence, the Commission's decision to amortize over a two-year period cannot be said to be arbitrary and capricious.

It is next argued that the Commission unlawfully and unreasonably reduced bad debt expenses. The Commission attempted to normalize bad debts, reasoning that 1978 had been an unusually cold year and that the bad debts in 1978 were running from 100 to 200 percent higher than in previous years.

The propriety of allowing a utility a proper expense for uncollectible accounts or bad debts is usual. *Pacific Gas & Electric Co. v. Railroad Commission,* 26 F. Supp. 507, 529 (N.D. Cal. 1939); *Chambersburg Gas Co. et al. v. P. S. C.,* 116 Pa. Super. Ct. 196, 225, 176 A. 794 (1935); *Re Hampton Water Works Co.,* 43 Pub. U. Rep. NS 321, Syl. ¶ 4 (N.H. 1941). The procedure utilized in the present case, matching revenues or sales with bad debts, appears to be in conformity with an accepted method of computation. See, *e.g., P. U. C. v. York Teleph. & Teleg. Co.,* 53 Pub. U. Rep. 3d 146 (Pa. 1963); *Re Michigan Consol. Gas Co.,* 36 Pub. U. Rep. 3d 289 (Mich. 1960); *Re Southern California Gas Co.,* 35 Pub. U. Rep. 3d 300 (Cal. 1960). Although the Commission appears to have based the present computation on the test year, most decisions appear to favor an averaging over a longer period of time. *Re Southwestern Bell Teleph. Co.,* 98 Pub. U. Rep. 3d 30

(Kan. 1973) (five years); *Re Southern Connecticut Gas Company,* 7 Pub. U. Rep. 4th 364 (Conn. 1974) (three years); *Re Consumers Power Co.,* 3 Pub. U. Rep. 4th 350 (Mich. 1974) (five years).

In the present case, the Commission's decision to adopt staff's adjustment appears to be based on two major considerations: (1) the utility's proposed 50 percent increase was speculative, and (2) the utility's proposal was unduly inflated due to abnormal conditions occurring in the test year.

Both propositions are supported by the evidence. Witness Holeman's testimony indicates the subjective nature of the requested allowance. Additionally, the unusual weather conditions occurring within the test year are a matter of history. It has been stated that abnormal or nonrecurring expenses may be disallowed entirely or amortized. *Cincinnati v. P. U. C.,* 161 Ohio St. at 400; see generally 3 Pub. U. Rep. Digest 2d, Expenses § 11 (1963). Since the test year should represent average normal conditions (*Customers of Electricity v. Village of Boonville,* 8 Pub. U. Rep. NS 493 [N.Y. 1935]), the Commission's allowance of staff's adjustment is reasonable in light of the historical abnormal conditions within the test year.

As far as the mathematical error alleged by Gas Service, it appears to us that the figure claimed to be erroneous is an opinion expressed by staff's expert and is erroneous only if one accepts the testimony of Gas Service's witness that it was arrived at by mismatching of sales and bad debts, a method the Commission did not use.

The utility additionally disagrees with the Commission's deletion of the expense of employing home economists as home service representatives. Gas Service relies on *Southwestern Bell Tel. Co. v. State Corporation Commission,* 192 Kan. 39, 73, 386 P.2d 515 (1963), wherein the Commission allowed as expense to the utility certain dues and charitable donations to the Chamber of Commerce. The Court stated:

"It is concluded that such expenditures are necessary if a company, firm or individual is to maintain its standing and good will in a community. Such expenditures should be allowed as a legitimate expense in any business. They are, however, subject to strict scrutiny by the Commission as to their reasonableness and propriety. Decisions may be found supporting both sides of the argument. Their review would serve no purpose here. It has not been the policy of this state to penalize any individual or corporation for assuming reasonable charitable and civic responsibilities."

In the present case, the Commission specifically found that the value of the service representatives mainly involved "the provision of good will to the Company." *Southwestern Bell* appears to be strong authority for the proposition that such a finding mandates a reversal of the Commission's disallowance of this expense.

On the other hand, *Southwestern Bell* may be distinguished on the basis that it involved charitable donations and dues as opposed to salaries paid to Gas Service employees. Additionally, the use of the term "good will" by the Commission, though unfortunate when considering the rule of *Southwestern Bell,* appears to indicate that the expenses were disallowed because they were not beneficial to the utility's business function and thus not properly includable as an appropriate expense. The Commission could have reasonably found that such items were more in the nature of an unreasonable promotional expense rather than a charitable or civic activity. Even if *Southwestern Bell* applies, the strict scrutiny standard is to be used by the Commission and arguably this Court should pay extreme deference to the Commission's decision in such regard.

Finally, there appears to be merit to the Commission's argument that the expenses claimed were not reasonably established in light of the absence of testimony regarding the benefit derived from the expenditures and the time spent by the employees in the performance of their various services. The mere actuality of an operating expense does not establish its reasonableness or necessity and a mere increase in expenditures does not necessitate rate adjustment. *In re Wilm. Sub. Water Corp.*, 58 Del. 8, 39, 203 A.2d 817 (Del. Super. 1964). It has been held that a commission may disallow any expenditure for promotional practices or advertising from operating expenses for rate-making purposes unless the utility establishes that such expenditure is beneficial to all customers. *State v. Oklahoma Gas and Electric Company,* 536 P.2d 887, 894 (Okla. 1975).

We are fully cognizant of the fact that this particular issue represents a very small percentage of the money involved and the parties did not devote an undue amount of time to this issue. Based on the record before us, we cannot say the order is unreasonable as it does reveal that the employees spent a percentage of their time on such things as teaching gourmet cooking classes as

opposed to conservation instruction. Even if we were to hold the order to be unreasonable, it is such an infinitesimal sum when compared to the amount involved in the rate hearing that it does not have an impact significant enough to justify reversal solely on this point.

The Commission relied primarily on two factors in reaching its decision to reduce payroll expenses: (1) decline in employee levels and (2) end-of-period payroll expenses that were more correctly computed by staff. The determination of the reasonableness of the Commission's action is essentially a factual one.

The staff presented convincing evidence that the employee levels declined during the test year and, by reasonable implication, the requested payroll expenses were overstated by Gas Service's failure to take such fact into consideration. Second, the staff's application of payroll increases to certain payroll levels, as adequately described in the Commission's decision, appears to be a reasonable method of computing payroll expenses. Additionally, the utility's method clearly provides for a substantial amount of payroll expense ($1,308,879) based on future expenditures which are arguably speculative and remote. The staff's computation allowed for a few specific out-of-period adjustments where employee levels and payroll adjustments are relatively certain, but disallowed a majority of the other requested expenses. Considering the nature of the testimony adduced, it appears that the Commission's adoption of staff's methodology is not unreasonable.

The Commission decreased operating and maintenance expenses based on conflicting testimony. Gas Service wanted to "normalize" operation and maintenance expenses, claiming the test year expenses were abnormally low compared to anticipated and budgeted expenses. The Commission's disallowance of the requests recognizes the reasonableness of the test year data, particularly relying on Gas Service's own testimony that budgeted expenditures have been historically overstated. Based on the evidence adduced at the hearing and the general rules regarding out-of-period adjustments, the Commission's decision is based on adequate evidence. Considering the historical data as to prior budgeted items, the Commission's refusal to base its rates on information it considered speculative appears to be reasonable.

A controversy arose over property taxes for 1979. Again, the

argument raised by Gas Service is a question of fact. The Commission adopted the staff's computation of total company assessment, based on the January 1, 1978, figure over the increase proposed by Gas Service, based on estimates as of June 30, 1978, because the former figure was a known figure occurring within the test year, whereas the latter figure was unknown and speculative. Such action cannot be termed unreasonable. Since any estimate in this regard is speculative, the Commission's decision to rely on historical data instead of projected increases cannot be said to be unreasonable.

The Commission modified deferred taxes to reflect the cost of removal. Both parties agree the subject of deferred tax accounting for cost of removal is complex. Gas Service explains it as follows:

"It involves federal income tax law and is tied into depreciation rates. Over the years, the tax law has changed the accounting of tax depreciation for a public utility. Prior to 1969, most regulatory commissions required that accelerated depreciation be 'flowed through' to utility customers. With the Tax Reform Act of 1969, 'normalization' of tax benefits was required if the utility chose to use an accelerated method of accounting for tax depreciation. (§ 167(1)(3)(G) of the I.R.C.) Normalization is the adjustment of the tax expense allowed for rate making so that it equals the amount which would have been payable if the straight-line method had been used to compute the depreciation expense deduction on the tax return. The difference between book and tax accounting under normalization is deferred over a period of time and subsequently recognized. 'Flow through' is the regulatory practice of recognizing the tax benefits of accelerated depreciation in the year that they are taken on the tax return. Gas Service uses accelerated depreciation and normalizes the tax benefits for regulatory purposes on its books through a deferred account."

Staff comments that:

"The problem arises because of differences in the determination of income for tax purposes and book purposes for various accounting items. Thus, in a given year a company may use a higher depreciation rate, and consequently greater deductible depreciation expense, for tax purposes than for book purposes. The actual taxes paid are therefore less than the book treatment would indicate. The depreciation recognized for tax purposes will not be reflected on the books until subsequent years. For rate-making purposes, this timing difference is treated two possible ways, as determined by the Internal Revenue Code and the Commission. The two approaches are known as normalization and flow-through.

"Under normalization, the amount of income taxes, or tax expense, is normalized so that it is considered equal to the book treatment. The tax benefits from use of accelerated depreciation are deferred and recognized for rate-making purposes over a subsequent period of time.

"Under flow-through, the tax benefits are recognized for rate-making purposes in the same year in which the greater deduction is taken on the income tax return.

Flow-through thus passes on to the ratepayer the lower actual taxes paid by the utility for a given year. The term flow-through should be distinguished from flow-back, which refers to deferral and subsequent recognition under normalization.

"The purpose of both of the above approaches is to reconcile the difference between book treatment and tax treatment of various items so that the ratepayer at some point receives the same tax benefits as the utility. Although the testimony on this issue occasionally refers to flow-through, the normalization approach is the primary concept involved."

Neither party cites a case, utility decision, or tax regulation in support of its position, leading us to believe it is a policy decision for the Commission based on the evidence before the Commission. Substantial evidence is in the record to support the Commission's choice, thus we cannot say it is unreasonable.

In summary, many of Gas Service's complaints are that the Commission should have adopted different accounting principles or reached different results from those desired by Gas Service. The Commission gave consideration to each item on the merits, then exercised its discretion, and we find no clear and major mistakes of sufficient importance to justify setting aside the order of the Commission. *Southwestern Bell Tel. Co. v. State Corporation Commission,* 192 Kan. at 87.

Affirmed.