STATE ex rel., MISSOURI PUBLIC SERVICE CO., Relator-Appellant,

v.

Charles J. FRAAS, et al., Defendants-Respondents.

No. WD32075.

Missouri Court of Appeals, Western District.

Dec. 22, 1981.

Motion for Rehearing and/or Transfer to Supreme Court Overruled and Denied Jan. 26, 1982.

Gary J. Brouillette, Jackson, Dillard, Brouillette & Farchmin, William H. Sanders, D. Brook Bartlett, Blackwell, Sanders, Matheny, Weary & Lombardi, Kansas City, for relator-appellant.

Kent M. Ragsdale, Holly E. Peck, Jefferson City, for defendants-respondents.

Before KENNEDY, P. J., and SHANGLER and WASSERSTROM, JJ.

WASSERSTROM, Judge.

Missouri Public Service Company ("the Company") sought approval of the Public Service Commission ("the Commission") of new tariffs filed September 1, 1978, which proposed to increase electricity revenues by approximately $22,100,000 and gas revenues by approximately $1,400,000. The effective date for the tariffs was suspended under Section 393.150.[1] By order dated July 19, 1979, the Commission approved an increase in electricity revenues of $1,351,307 and gas revenues of $46,096. Believing those increases so granted to be inadequate, the Company filed a petition for review in the circuit court. The circuit court affirmed the Commission, and the Company now appeals here.

By its points relied on, the Company complains of affirmance by the circuit court of the following aspects of the Commission's order: (1) the establishment of a rate schedule which the Company says did not make proper allowance for attrition from inflation; (2) the inclusion in the Company's rate base of only 25% of the cost of constructing the Jeffrey Energy Center "common facilities"; (3) the exclusion of certain payroll expenses; (4) the exclusion from rate base of compensating bank balances; (5) the flow through instead of normalizing certain income tax timing differences; and (6) the alleged insufficiency of the Commission's findings of fact.

Before those issues can be considered, a threshold question, raised by the Commission on its motion to dismiss this appeal on the ground of mootness, must be considered.

## I.

### MOOTNESS

As the basis for its motion to dismiss, the Commission calls attention to the fact that subsequent to the order of July 19, 1979, which is here in question, the Company filed new tariffs on October 5, 1979, and part of the increases there requested were allowed under an order of the Commission dated August 25, 1980. In addition, the Company filed for still a further increase on September 5, 1980, which was permitted in part pursuant to a stipulation which was approved by a Commission order dated May 27, 1981. The rates currently being collected by the Company are governed by the order of May 27, 1981, and the new tariffs filed thereunder. The Commission says the order of July 19, 1979, and the tariffs filed under it, which are the subject of the present appeal, have been superseded, have

---

1. All statutory references herein are to RSMo 1978.

ceased to have any present effect, and any error therein no longer is of any consequence because there is no action which can now be taken by way of correction.

The Commission's argument correctly states the general rule. Any error which may have been made against the Company by reason of the order dated July 19, 1979, cannot now be corrected retroactively to give relief for the period of time that the old tariffs here questioned were in effect. *State ex rel. Utility Consumers Council, etc. v. P.S.C.*, 585 S.W.2d 41 (Mo.banc 1979); *State ex rel. Gas Service Company v. Public Service Commission*, 536 S.W.2d 491 (Mo. App.1976). Nor can those old tariffs now be amended prospectively, because the 1979 tariffs have been superseded by subsequent tariffs filed and approved. It is because of this inability by the reviewing court to give any relief, that issues under old, superseded tariffs are generally considered moot and therefore not subject to consideration. *State ex rel. Gas Service Company v. Public Service Commission, supra; State ex rel. Mo. Public Service v. Pierce*, 604 S.W.2d 623 (Mo.App.1980); *State ex rel. Mo. Public Service Co. v. Fraas*, 615 S.W.2d 587 (Mo. App.1981); *State ex rel. Kansas City Power & Light Company v. Public Service Commission of Mo.*, 615 S.W.2d 596 (Mo.App. 1981); *State ex rel. The Empire District Electric Company v. Public Service Commission of State of Mo.*, 615 S.W.2d 598 (Mo.App.1981).

An exception, however, is made where an issue is presented of a recurring nature, is of general public interest and importance, and will evade appellate review unless the court exercises its discretionary jurisdiction. *State ex rel. Laclede Gas Co. v. P.S.C.*, 535 S.W.2d 561 (Mo.App.1976); *State ex rel. The Empire District Electric Company v. Public Service Commission of State of Mo., supra; State ex rel. Laclede Gas Co. v. P.S.C.*, 600 S.W.2d 222 (Mo.App. 1980). The question of whether to exercise this discretionary jurisdiction comes down to whether there is some legal principle at stake not previously ruled as to which a judicial declaration can and should be made

for future guidance. If the matter in dispute is simply a question of fact dependent upon the evidence in the particular case, there is no necessity for a declaration of legal principle such as to call the exception into play.

In the present case, some of the issues raised by the Company fit within the exception to the mootness rule, while others do not. The mootness rule and its exception can best be dealt with here by considering them in connection with each issue separately.

## II.

## ATTRITION

The Company argues that in every given case the Commission sets rates based upon an historical test year. By the time the data for that year has been collected and reviewed, hearings held, and a decision reached by the Commission, the factual basis for that decision has already been rendered obsolete by inflation. To make the matter worse, the rates declared are then to be in effect for a future period, during which the ravages of inflation will further erode the relief granted. Still worse, judicial review through the circuit court and then the appellate court generally takes over two years, during which time new tariff filings become necessary, thereby starting the same process all over again. The Company says that the only solution to this situation is for the Commission to supplement the rate increase by adding an attrition factor.

In presenting this argument, the Company finds itself confronted with the serious hurdle that this court has already twice ruled this attrition issue moot within the last few months. *State ex rel. Mo. Public Service Co. v. Fraas, supra; State ex rel. Kansas City Power & Light Company v. Public Service Commission of Mo., supra.* The Company responds that application of the mootness doctrine to this problem deprives the public utilities of this state of any effective judicial review despite Article V, Section 18 of the Missouri Constitution

which guarantees the right of judicial review of administrative decisions. It further argues that the net result is to deny the utilities any opportunity to earn a fair return, thus violating due process. The Company characterizes the mootness doctrine as having developed "into a judicial killer that strangles or suffocates" the constitutional rights of the utilities.

The crowded docket of this court impedes the luxury of repeated consideration of the same issue, and the doctrine of stare decisis would amply warrant a declination to undertake reconsideration of an issue so recently decided. Nevertheless, the seriousness of the problem and the eloquence of the plea made by the Company have persuaded us to consider the matter once again.

■ There can be no argument but that the Company and its stockholders have a constitutional right to a fair and reasonable return upon their investment. That right carries as a corollary the duty by the Commission to consider all relevant factors including the effects of inflation. *State ex rel. Missouri Water Company v. Public Service Commission*, 308 S.W.2d 704 (Mo.1958); *New England T. & T. Company v. Dept. of Pub. Util.*, 371 Mass. 67, 354 N.E.2d 860 (1976); *So. Cent. Bell Tel. Co. v. La. Public Service Commission*, 352 So.2d 964 (1977); *New England Telephone & Telegraph Co. v. State*, 113 N.H. 92, 302 A.2d 814 (1973); *Potomac Elec. Power Co. v. Public Service Commission*, 402 A.2d 14 (D.C.1979); *Utah Power & Light v. Idaho Public Utility Commission*, 102 Idaho 282, 629 P.2d 678 (1981).

■ It is no answer to the foregoing duty to say that a forecast as to future inflation is merely speculative. Despite that hazard, the Commission must make an intelligent forecast with respect to the future period for which it is setting the rate; rate making is by necessity a predictive science. *State v. N.J. Bell Tel. Co.*, 30 N.J. 16, 152 A.2d 35 (1959).

■ Notwithstanding the general rules just stated, the Company's plea for an attrition allowance in this case must fail for at least two reasons. In the first place, the Company has not supplied sufficient proof that the Commission's rate making procedures will end up with a confiscatory result unless the attrition allowance is given. The Company's proof in this regard depends upon a set of statistics furnished by it to show that for the five year period 1974 through 1978, the Company had been unable to earn the rate of return authorized by the Commission.[2] Those statistics so offered by the Company are as follows:

| Year | Percent Return on Common Equity Authorized | Percent Return on Common Equity Earned | Percent Earned to Authorized |
|------|-----|-----|-----|
| 1974 | 13.85 | 10.50 | 75.8 |
| 1975 | 14.10 | 11.81 | 83.8 |
| 1976 | 14.0 | 13.41 | 95.8 |
| 1977 | 14.0 | 8.75 | 62.5 |
| 1978 | 12.7 | 7.29* | 57.4 |
|  | *Estimated | Average | 75.0 |

These statistics are supplemented by further evidence that the Company's common stock during the same period has rather consistently sold at below book value, which the Company's witnesses attribute to the short fall in earnings due to inflation and regulatory lag.

A number of utilities in other jurisdictions attempted to prove the need for an attrition allowance by the presentation of similar statistics. The courts have rather regularly answered that although a failure to earn the authorized rate of return is evidence of attrition, it is not conclusive; the differences between the permitted and the earned rates could have been due to a variety of factors other than inflation. *Massachusetts Elec. v. Dept. of Public Utilities*, 381 N.E.2d 325, 334 (Mass.1978); *Conn. Light & Power v. Public Utilities Control*, 176 Conn. 191, 405 A.2d 638 (1978); *New England Tel. v. Public Utility Commission*, 376 A.2d 1041, 1050 (R.I.1977); *Public Service Commission of Md. v. Baltimore Gas &*

2. Similar statistics were introduced by the Company at its 1977–78 rate hearing, as MPS Exh. No. 1, Section 7, Schedule 2, Case No. GR–78–30. That exhibit was referred to and the significance argued in the Company's brief to this court in *State ex rel. Mo. Public Service Co. v. Fraas, supra.*

*Elec. Co.*, 273 Md. 357, 329 A.2d 691, 699 (1974); *Maine Water Co. v. Public Util. Commission*, 388 A.2d 493, 497 (Me.1978).

The record in this case indicates that inefficient management would tend to explain at least in part the short fall between the allowed and earned rates of return.[3] One instance of mismanagement, according to the Commission's findings, was an insufficient supply of coal going into the coal miners' strike of 1977–78, which was caused by the Company's carelessness and mismanagement. Another matter of questionable management was what the Commission considered to be an imprudent ratio of equity to borrowed capital, for which reason the Commission conditioned an interim increase of rates in 1978 upon the Company selling additional capital stock. This action by the full Commission in 1978 seems to constitute at least a partial adoption by the Commission of the severe criticism of the Company's financial management made by Commissioner Jones in his dissenting opinion in the Company's 1978 rate cases, No. ER–78–29 and No. GR–78–30.

Whether these criticisms of the Company's management policies were valid and the extent to which those management policies affected the short fall in earnings, were matters of factual determination to be made by the Commission. The existence of these factual questions leave the whole attrition question under the general rule of mootness and prevent the application of the exception which would call upon this court to exercise its discretionary jurisdiction.

The Company has attempted to supply additional evidence on the need for an attrition allowance, by supplying in this court a series of affidavits, including affidavits from other utilities, tending to show that all utilities in this state are suffering and have suffered for some period of time a short fall

of earnings due to inflation combined with regulatory lag. The reception of those affidavits has been opposed by the Commission, and as an alternative the Commission has requested permission to supply opposing affidavits and to take depositions to cross-examine the affiants offered by the Company. The Company's effort to produce this additional proof comes too late and is offered to the wrong body. The time and place for the taking of evidence is at the hearing before the Commission. The courts do not have that function, and the affidavits now offered here cannot be considered.

Still another obstacle stands in the way of ordering an attrition allowance. A number of devices are available and have been used in rate cases to counter inflation. One method of coping with this problem is "trended cost" of capital investment, which was suggested by the Missouri Supreme Court in *State ex rel. Missouri Water Co. v. Public Service Commission*, 308 S.W.2d 704 (Mo.1958) and which has been utilized by the Commission since that time. *See also State v. N.J. Bell Tel. Co., supra.* Another device is the "discounted cash flow" calculation which has been and continues to be used by the Commission. Another device is the use of a year-end rate base rather than taking a full year average. 1 Priest, Principles of Public Utility Regulation 205 (1969); 54 Boston U.L.Rev. 873 (1974); *Potomac Elec. Power Co. v. Public Service Commission, supra.* This device also has been adopted by the Commission and was used by it in this case.

Even more and newer devices to meet the inflation problem have been suggested and used. One such new device now being urged is the use of a future or "projected test year" instead of an historical test year. Note, The Use of the Future Test Year in Utility Rate-Making, 52 Boston U.L.Rev.

---

**3.** Mismanagement would deprive a public utility of any complaint about insufficient earnings. A rate tariff is intended only to permit an opportunity to make the percentage of return determined by the Commission to be reasonable. As put by one authority, "the utility's return allowance might be compared with a fishing or hunting license with a limit on the

catch. Such a license does not guarantee that the holder will catch anything at all; it simply makes the catch legal (up to a specified limit) provided the holder is successful in his own efforts." 1 Priest, Principles of Public Utility Regulation 202 (1969) (quoting Welch, Cases and Text on Public Utility Regulation 478 (Rev. Ed.1968)).

791 (1972). *See, New England Tel. & Tel. Co. v. Public Utilities*, 390 A.2d 8 (Me.1978). This particular approach would not be available in Missouri because of the adoption by popular vote of Initiative Proposition 1, now Section 393.135. However, the Commission in this case did use a modified version of the projected year model by utilizing a test year which was adjusted to take into account known and measurable future changes. That concept was implemented by the holding of what the Commission denominates as "a true-up hearing."

The device last mentioned was used in projecting rates for the Company for the first time in the present case. For that reason, the short falls so heavily relied upon by the Company to show the need for an attrition allowance may not be representative of what can be expected henceforth. Even if this latest device fails of complete success, other ideas may be available which the Commission may consider preferable to an attrition allowance. For example, the Commission may determine that greater desirability lies with a more liberal allowance of expenses claimed by the Company and a more liberal inclusion of items into the rate base, perhaps combined with a somewhat higher basic rate of return. *See, New England Telephone & Telegraph Co. v. State*, 113 N.H. 92, 302 A.2d 814 (1973). As to the potential unwholesome effect on the economy of imbedding an attrition rate into rate making, see *Southwest Bell Tel. Co. v. State Corporation Commission*, 192 Kan. 39, 386 P.2d 515, 553 (1963). The choice of method with which to meet the inflation problem rests largely within the expert discretion of the administrative body, and for that reason the court will not presume to dictate the choice of method to the Commission. *New England Tel. & Tel. Co. v. Public Utilities, supra; State v. N.J. Bell Tel. Co., supra; Potomac Elec. Power Co. v. Public Service Commission, supra.*

For all of the reasons stated, the attrition issue does not lend itself to judicial pro-nouncement. We therefore repeat and reaffirm the ruling that the attrition issue is subject to the general mootness doctrine, as previously set forth by this court in *State ex rel. Mo. Public Service Co. v. Fraas, supra,* and *State ex rel. Kansas City Power & Light Company v. Public Service Commission of Mo., supra.*

Before leaving this subject, however, it will not be amiss to mention that not even the Commission has a free hand in dealing with the very vexing problem of inflation. At one time it attempted to meet the problem partially by adopting a "fuel adjustment clause." The Missouri Supreme Court in *State ex rel. Utility Consumers Council, etc. v. P.S.C., supra,* held that the device mentioned was improper because not within statutory authorization. However, a concurring opinion stated: "In these times of energy crises it seems regrettable that we must reach this result. I hope the Legislature will address the problem without undue delay." The urgency of the inflation problem in utility rate making and the desirability of legislative action remain just as keen now.[4]

### III.

### JEFFREY COMMON FACILITIES

■ The Company participates to the extent of a ⅛th interest in the construction of Jeffrey Energy Center ("JEC") which will ultimately consist of four generating plants. The first of those plants came on line during the test year, but the other three were not due to become operational until 1980, 1983 and 1985 respectively. Certain common facilities were built initially to be used by Plant No. 1, but those common facilities are sufficient to accommodate future use by the additional three plants as they successively come on line.

The Company seeks to include all of these common facilities into the current rate base on the ground that these facilities are complete and necessary for the operation of

---

4. Among other possible changes which the legislature might want to consider would be a provision for filing petitions for judicial review directly in the court of appeals, thus considerably reducing regulatory lag by eliminating the circuit court level of review.

Plant No. 1. The Commission ruled to the contrary, holding that only 25% of those costs should be allowed currently. In that respect, the Commission's report reads as follows:

"While the foregoing has referred to Staff's position as an adjustment for convenience, the record reveals that Staff has presented this issue to the Commission for a policy decision. The Commission finds that common facilities and indirect costs incurred in the building of multi-unit plants should be allocated to each unit with the exception of the water supply system that is only used for units 1 and 2. Company's evidence shows that all facilities involved are necessary for the operation of JEC-1. The Commission does not refute such contention but is of the opinion that such fact is irrelevant. The crux of the matter is that the common facilities were designed to serve all four units at JEC. The question presented to the Commission is whether the ratepayer is to pay now or pay later. The Commission is of the opinion that Company's argument that Staff's position will cost more is nothing more than the general argument advanced against Proposition 1 [Section 393.135 RSMo, 1978]. All the facilities involved in this issue were designed to serve all four units. The Commission finds that the ratepayer should not be burdened with facilities which are not yet used or useful in the operation of units 2, 3 and 4."

The only evidence with respect to the use and usefulness of the Jeffrey Common Facilities during the test year was the expert testimony of Gerald G. Mounts. He testified that he had studied each of the basic components of the common facilities which were the construction site itself, water make-up facilities, water treatment facilities, fuel oil facilities, plant administration facilities, rail facilities, ash handling facilities, cooling towers and related circulating water systems, coal handling systems, and engineering, legal and other related expenses or services. He further testified that in his expert opinion all of those systems were used and useful for the first

unit, that the first unit could not be operated without them, and that all of the facilities mentioned would be required even if for example unit No. 2 was somehow canceled.

The Commission staff did not contradict any of Mounts' testimony. It did not introduce any evidence or even claim that the common facilities were overbuilt so far as use by Plant No. 1 is concerned or that any of the facilities were enlarged because of contemplated future use for the other three plants. Thus no factual dispute exists. In the terminology used by the staff, the issue is purely a "policy decision"—or to put it another way, this is purely an issue of law.

We disagree with the Commission that the crux of the matter "is whether the ratepayer is to pay now or pay later." Rather, the real question is whether the stockholders shall be permitted a fair return on the money which they have expended on these common facilities and which during the test year were in full use. As a matter of constitutional as well as statutory right, these stockholders of the Company are so entitled.

*Re Florida Power & Light Company*, 98 P.U.R.3d 441 (Fla.1973), cited by the Commission, is not in point. In that case the entire cost of a cooling lake had been included by the utility company in its rate base, but the only use currently made of the lake was for unit No. 4. 20% of the cost of the lake had been incurred for unit No. 5, not yet dedicated to public service. The Florida Commission held that a cost allocation was necessary so that the public would not be charged for the value of property under construction for unit No. 5 which was not yet "used and useful in serving the public." In our case, to the contrary, all of the common facilities were during the test year used and useful for the operation of Plant No. 1.

Nor is Section 393.135 (Initiative Proposition No. 1) applicable to the present situation. That section provides:

"Any charge made or demanded by an electrical corporation for service, or in

connection therewith, which is based on the costs of construction in progress upon any existing or new facility of the electrical corporation, or any other cost associated with owning, operating, maintaining, or financing any property before it is fully operational and used for service, is unjust and unreasonable, and is prohibited."

As already pointed out, these common facilities were fully operational and used for service in the test year.

The common facilities issue falls within the exception to the mootness doctrine, and it is appropriate for this court to make a declaration of law in that respect. The ruling of the Commission with respect to this issue is disapproved.

## IV.

## PAYROLL EXPENSE

The parties had agreed that after the close of the principal hearings, an additional hearing would be held to receive additional evidence on specified matters. At the supplemental hearing, the Company offered to prove that it had increased its payroll by 25 employees and asked that this additional expense be taken into account. The staff resisted any such consideration on the ground that this matter was outside the stipulation of reserved issues.

The Commission's findings and report do not mention this payroll matter. It is quite apparent that the Commission agreed with the staff that this question had not been reserved under the stipulation. The question is peculiar to this case, with the ruling being confined to the particular facts here. The issue is not within the exception to the mootness doctrine and therefore will not be reviewed by us.

## V.

## COMPENSATING BANK BALANCES

█ The Company maintains lines of bank credit totaling $28,000,000, which require that compensating bank balances be retained on deposit in the lender bank, as shown by the following chart:

| BANK | AMOUNT | COMPENSATING BALANCE REQUIRED |
|------|--------|-------------------------------|
| 1. Citibank of New York | $12,000,000 | 10% of line plus 10% of amt. borrowed |
| 2. Commerce Bank of Kansas City | $ 8,000,000 | 15% flat rate |
| 3. 1st Nat. Bank of Chicago | $ 5,000,000 | 10% of line plus 10% of amt. borrowed |
| 4. 1st Nat. Bank of Kansas City | $ 3,000,000 | 10% of line plus 10% of amt. borrowed |

The Company claims that these compensating balances constitute a capital requirement which should be included in its rate base. The Commission held to the contrary, based on the following findings: (a) that the Company maintains its lines of credit virtually without use; (b) that there are less expensive methods of financing short term borrowings; and (c) that the bank lines have been used to support the Jeffrey Energy Center Trust and the Greenwood Four Trust (both of which are mechanisms through which to finance construction work in progress).

The finding of the Commission that the Company "has continued to maintain its lines of credit virtually without use" seems to be in contradiction to the findings which immediately preceded that, and in which the Commission stated:

"While not actually borrowing any funds except as noted above, Company utilizes its lines of credit to support commercial paper. The commercial paper brokers require bank lines as the backup to support the sale of commercial paper. The Commission notes that commercial paper costs the consumer less than direct borrowing under the lines of credit. This is true because commercial paper is sold at a cheaper interest rate than that required for direct borrowing under the lines of credit. Thus, the lines of credit are incumbered to the extent of commercial paper sales according to the Company even though no actual borrowings occur...."

However, whether any cheaper method of financing is available, as for example through commitment fees, is a question of fact, and as such does not fall within the exception to the mootness rule. This pre-

vents the issue of compensating balances from being reviewed by this court. *See State ex rel. Mo. Public Service Co. v. Fraas, supra.*

■ Moreover, the record shows that most if not all of the short term financing in question is used in connection with construction work in progress. The Company failed to make any effort to carry its burden of proof to show how much of the short term borrowings were for anything other than construction work in progress. Although there is diversity in the making of allowance for compensating bank balances,[5] certain well-considered cases hold that to the extent compensating bank balances are used for the purpose of supporting the financing of construction work in progress, that cost is not to be included in the rate base, but instead should be allowed in the Allowance for Funds Used During Construction: Re Arkansas Power and Light Company, 19 P.U.R.4th 53 (Ark.1977); *Boston Edison v. Dept. of Public Utilities,* 375 Mass. 1, 375 N.E.2d 305 (1978). The rulings in the latter cases seem in accord with and indeed demanded by Section 393.135. To the extent of this adoption of the rule stated in those cases, a declaration of law to that effect is appropriate under the exception to the mootness doctrine.

## VI.

### NORMALIZATION

■ On staff recommendation, the Commission allowed normalization of the following tax timing differences: tax credit, accelerated depreciation, amortization of extraordinary purchased power costs and numerous quick turn around items. On the other hand, it disallowed and ordered flow through of the following items: funds used during construction, pensions and taxes capitalized, Jeffrey Energy Trust deduction and removal costs. The Company argues that it should have been allowed normalization of all of said items.

The problem of normalization as against flow through treatment was discussed by this court in *State ex rel. Utility, etc. v. Public Service Commission,* 606 S.W.2d 222 (Mo.App.1980), in which it was held that the choice in that regard is a matter of administrative discretion. The Commission has adopted the policy that "cash flow, interest coverage and internally generated funds analyses will determine the need of a given company for normalization." Applying that principle, the Commission considered staff testimony which reflected an optimistic appraisal of the Company's position in those regards. The Company's case presented a more gloomy analysis, but the Commission found that the staff's analysis was the proper one to be followed. This presents a purely factual question which does not fall within the exception to the mootness doctrine. This matter therefore will not be reviewed. *State ex rel. Mo. Public Service Co. v. Fraas, supra.*

## VII.

### THE FINDINGS OF FACT AND CONCLUSIONS OF LAW

■ For its final point, the Company argues that the Commission's findings and conclusions are legally insufficient. The 33 pages of findings and conclusions by the Commission are in the discursive form which the Commission has regularly used, rather than being divided into numbered paragraphs and subparagraphs. However, that form of Report and Order has long been accepted by the courts without objection.

The findings and conclusions here have been sufficiently definite and certain and specific under the circumstances of this particular case to enable the court to review the decision intelligently and ascertain if the facts afford a reasonable basis for the order without resorting to the evidence. These findings and conclusions meet the

---

5. *Kansas-Nebraska Natural Gas Company v. State Corporation Commission,* 4 Kan.App.2d 674, 610 P.2d 121 (1980); *Gas Service Co. v. State Corporation Commission,* 4 Kan.App.2d

623, 609 P.2d 1157 (1980); *N.W. Pub. Serv. v. Cities of Chamberlain, etc.,* 265 N.W.2d 867 (S.D.1978); Public Utilities Fortnightly, March 16, 1978, Vol. 101, No. 6, p. 44.

requirements laid down in *Glasnapp v. State Banking Board*, 545 S.W.2d 382 (Mo. App.1976) and the authorities therein cited. The Company's objection to the sufficiency of the findings and conclusions is therefore overruled.

As to those issues held above to be within the general mootness rule, this appeal is dismissed. As to those issues held above to be within the exception to that doctrine, the principles of law declared in this opinion shall stand for future guidance.

All concur.