**STATE of Missouri ex rel. PRAXAIR, INC. and Explorer Pipeline Company and Office of the Public Counsel, Appellants,**

v.

**PUBLIC SERVICE COMMISSION OF THE STATE OF MISSOURI and Empire District Electric Company, Respondents.**

Nos. WD 71988, WD 71989.

Missouri Court of Appeals, Western District.

Oct. 26, 2010.

Motion for Rehearing and/or Transfer to Supreme Court Denied Dec. 7, 2010.

Application for Transfer Denied Jan. 25, 2011.

Lewis R. Mills, Jr., Jefferson City, MO for appellant Office of the Public Counsel, Stuart W. Conrad and David L. Woodsmall, Jefferson City, MO for appellants Praxair, Inc. and Explorer Pipeline Company.

Jennifer L. Heintz, Steven C. Reed and Eric Dearmont, Jefferson City, MO for respondent Missouri Public Service Commission; Diana C. Carter, James C. Swearengen and L. Russell Mitten, Jefferson

City, MO for respondent Empire District Electric Company.

Before Division Three: VICTOR C. HOWARD, Presiding Judge, THOMAS H. NEWTON, Judge and GARY D. WITT, Judge.

GARY D. WITT, Judge.

The Office of the Public Counsel ("OPC"), Praxair, Inc. and Explorer Pipeline Company ("Industrials") appeal the order of the Public Service Commission ("Commission"), which granted the Empire District Electric Company ("Empire") its requested general rate increase for its retail electric service. For the reasons set forth in this opinion, we affirm.

## Factual Background

On February 1, 2006, Empire filed proposed tariff sheets designed to implement a general rate increase for its retail electric service (Case No. ER–2006–0315). Empire is an electrical corporation within the meaning of Section 386.020(15), and a public utility within the meaning of Section 386.020(43).[1] The new proposed rates were designed to produce an additional $29,513,713 in gross annual electric revenues (excluding gross receipts, sales, franchise, and occupational taxes), which was a 9.63% increase over existing revenues. The tariff sheets proposed an effective date of March 3, 2006.

The Commission allowed Praxair, Inc, Explorer Pipeline Company, Aquila, Inc.,

Kansas City Power & Light, and the Missouri Department of Natural Resources, to intervene in this matter.

Subsequently, the Commission held the main evidentiary hearing in this matter in September of 2006, and a "true-up"[2] hearing in November 2006. During these hearings, the Commission heard the testimony of forty-four witnesses, and over one hundred exhibits were admitted into evidence.

On December 21, 2006, the Commission issued its Report and Order, which denied Empire's requested tariffs but directed Empire to "file proposed electric service tariff sheets in compliance with this Report and Order." Shortly thereafter, Empire filed revised tariffs sheets with a request for expedited treatment so that the tariffs would go into effect on January 1, 2007. On December 29, 2006, the Commission issued its Order Granting Expedited Treatment and Approving Tariffs.

On January 1, 2007, Empire began providing service and charging customers pursuant to the tariffs authorized by the Commission.

OPC then filed a petition for extraordinary relief based on the expedited nature of the tariff approval, which was ultimately granted by the Missouri Supreme Court based on its conclusion that the Commission "abused its discretion [in not] provid[ing] public counsel with a reasonable period of time in which to appeal the order." *State ex rel. Office of Pub. Counsel*

1. All statutory citations are to RSMo 2000, as updated through the 2009 Cumulative Supplement, unless otherwise indicated.

2. In *State ex rel. Missouri Public Service Co. v. Fraas*, 627 S.W.2d 882, 887–88 (Mo.App. W.D.1981), we outlined the purpose of a "true up hearing": "Even more and newer devices to meet the inflation problem have been suggested and used. One such new device now being urged is the use of a future or 'projected

test year' instead of an historical test year.... [T]he Commission in this case did use a modified version of the projected year model by utilizing a test year which was adjusted to take into account known and measurable future changes. That concept was implemented by the holding of what the Commission denominates as 'a true-up hearing.'" *Id.* (citations omitted).

*v. Pub. Serv. Comm'n,* 236 S.W.3d 632, 637 (Mo. banc 2007).

On December 4, 2007, the Commission issued an order vacating its original order; however, the Commission issued another order again approving the tariffs in question. OPC again sought extraordinary relief, and October 14, 2008, the Missouri Supreme Court granted the writ of mandamus stating that the Commission "is directed to comply completely with this Court's previous mandate and opinion" because the Court found that the Commission had failed to vacate its December 2006 order in light of the fact that the "commission sought to do more than restore the existing status but also determine the effect on those moneys collected under the tariffs the commission had previously approved." *State ex rel. Office of Pub. Counsel v. Pub. Serv. Comm'n,* 266 S.W.3d 842, 843 (Mo. banc 2008).

On November 20, 2008, the Commission issued its Order Denying Applications For Rehearing, thus allowing its original order to be subject to review.[3] On December 15, 2008, OPC filed its Petition for Writ of Review in the Cole County Circuit Court, and on December 19, 2008, the Industrials also filed their Petition for Writ of Review in the same court. These matters were consolidated, and on December 28, 2009, the circuit court issued its Judgment that found "that the Report and Order of [the Commission] is both lawful and reasonable" and "affirmed [the Order] in all aspects."

OPC and the Industrials now appeal. Further details regarding the relevant disputed issues are outlined as applicable in the analysis section below.

## Standard of Review

We set forth our applicable standard of review in *Hurricane Deck Holding Co. v. Public Service Commission,* 289 S.W.3d 260, 263 (Mo.App. W.D.2009) (citations and internal quotation marks omitted):

> Our review of commission decisions is limited to determining whether or not the commission exceeded its constitutional and statutory authority or otherwise acted unlawfully; whether or not competent and substantial evidence on the whole record supported its decision; whether or not its decision was based on lawful procedure or a fair trial; and whether or not the commission acted arbitrarily, capriciously, unreasonably, or abused its discretion.

> An order's lawfulness turns on whether the PSC had the statutory authority to act as it did. When determining whether the PSC's order is lawful, the appellate courts exercise unrestricted, independent judgment and must correct erroneous interpretations of the law. On appeal, this court reviews the decision of the Commission, not the judgment of the trial court. The Commission's order is presumed to be valid, and the challenger bears the burden of disproving its validity.

## Analysis

At the outset, we must first address Empire's argument that this Court should dismiss this appeal in its entirety "because all issues herein are moot, in that intervening events make a decision unnecessary and it is impossible for this Court to grant effectual relief." " 'A threshold question in any appellate review of a con-

---

**3.** It should be noted that the Commission's order in 2006 was amended in a "January 15, 2007 order of clarification," and that on March 26, 2008, the Commission issued its Order Granting Reconsideration of Report and Order. However, on appeal no party asserts that the substance of these revisions is consequential to any issue raised on appeal.

troversy is the mootness of the controversy.'" *Mo. Pub. Serv. Comm'n v. Mo. Interstate Gas, LLC,* 266 S.W.3d 881, 885 (Mo.App. W.D.2008) (quoting *Mo. Dep't of Health & Senior Serv. v. Winkler (In re: Duvall),* 178 S.W.3d 617, 621 (Mo.App. W.D.2005)). "'A case is moot when the question presented for decision seeks a judgment upon some matter which, if the judgment was rendered, would not have any practical effect upon any then existing controversy.'" *Id.* (quoting *Atteberry v. Mo. Bd. of Prob. & Parole,* 193 S.W.3d 444, 446 (Mo.App. W.D.2006)).

Here, Empire argues that because subsequent tariffs have been approved and implemented by the Commission since the tariff rate increases in question in the instant appeal, the issues at dispute on appeal have therefore been rendered moot.[4] To support this argument, Empire relies almost exclusively on our holding in *State ex rel. City of Joplin v. Public Service Commission,* which dealt with the issue of mootness within the specific context of Commission proceedings. 186 S.W.3d 290, 296 (Mo.App. W.D.2005). Empire focuses solely on the following proposition: "When tariffs are superseded by subsequent tariffs that are filed and approved, the 'superseded tariffs are generally considered moot and therefore not subject to consideration'" because "superseded tariffs cannot be corrected retroactively." *Id.* at 295 (quoting *State ex rel. Mo. Pub. Serv. Comm'n v. Fraas,* 627 S.W.2d 882, 885 (Mo.App. W.D.1981)). Yet on appeal Empire ignores that we found this proposition was not dispositive of the mootness issue in *Joplin.* The following principles that governed the resolution of the *Joplin* case, led this Court to hold that the issues in question were in fact *not* moot:

> There are several reasons why we believe that the case is not moot, notwithstanding the fact that the 2000 rates have been superseded.... It is not unusual in public-utility rate cases for new tariffs to overtake proceedings involving old tariffs, and the 2001 remand here, along with the unrelated proceedings that delayed Commission action pertaining to the remand, ensured that this would occur.

*Id.* at 296.

■ Here, like in *Joplin,* because legal disputes surrounding this case have been before this Missouri Supreme Court *twice,* this essentially "ensured" that the tariffs at issue would potentially be superseded by subsequent tariffs. For similar reasons, outlined in *Joplin,* we believe that an exception to the mootness doctrine allows this Court to hear the merits of the instant appeal.

■ "[A]n exception to the mootness doctrine ... exists [w]here the issue raised is one of general public interest and importance, recurring in nature and will otherwise evade appellate review unless the court exercises its discretionary jurisdiction." *Jackson Cnty. Bd. of Election Comm'rs ex rel. Brown v. City of Lee's Summit,* 277 S.W.3d 740, 745 (Mo.App. W.D.2008) (citation and quotation marks omitted). Invocation of this exception to the mootness doctrine is within this Court's discretion when it is demonstrated that the case in question "presents an is-

4. It is undisputed on appeal that the tariffs in question were first implemented by the Commission in 2007, and that since that time Empire initiated a second distinct rate case (Case Number ER–2008–0093) that was approved by the Commission in 2008 and that, therefore, "Empire is currently providing service under the tariffs approved by the 2008 Tariff Order." Indeed, it is apparent that Empire has since initiated a *third* rate case in 2009, which Empire states that it will have "another set of tariffs approved and in effect by the end of September, 2010."

sue that (1) is of general public interest; (2) will recur; and (3) will evade appellate review in future live controversies." *Id.* (citation and quotation marks omitted).

Without any further elaboration or support, Empire argues simply that "review of the subject rate case does not involve an issue of general public interest and importance, recurring in nature, which will otherwise evade appellate review" because "many of the issues raised herein are already before this Court in the appeals initiated by OPC and Industrials with regard to the decisions of the Commission in Case No. ER–2008–0093 (Case No. WD72119)." We disagree.

Ironically, in arguing that the current issues on appeal are not ones that "will recur," Empire points out precisely the opposite by illustrating just how these issues are duplicative to a subsequent related appeal and thus, by their very nature, are in fact recurring. Of course, it only makes sense then to resolve these issues in the first instance, especially since if we follow Empire's logic on appeal these issues may continually evade review. Specifically, as Empire points out, a new rate increase is expected to take place in September 2010, which, therefore, will be a new means for Empire to argue that these same issues will be moot in appeal WD72119 by the time this Court has the opportunity to address those issues sometime *after* the time period of the new rate increase. Finally, because we believe that the subject matter at hand (regarding the cost at which retail electric services are provided to the public at large in certain portions of Missouri) is *inherently* "of general public interest," we refuse Empire's invitation to dismiss the instant appeal.

■ In Point One, Industrials argue that the Commission erred in quashing subpoenas for two witnesses because Industrials have a statutory right to subpoena witnesses under section 536.070(2), which provides that "[e]ach party shall have the right to call and examine witnesses."

Because Industrials complain that its "statutory right" was violated by the Commission in its failure to hold a full and fair evidentiary hearing, we must first outline the scope of the hearings that were held by the Commission in this matter. Pursuant to the procedural schedule, the Commission convened an evidentiary hearing on September 7, 2006, at its offices in Jefferson City, Missouri. Proceedings continued during that week and during the week of September 15th. The "true-up" portion of the hearing was held on November 20th. In total, the Commission heard the testimony of forty-four witnesses, and 153 exhibits were offered into evidence during the hearing, most of which were admitted.

Industrials complain that they were not allowed to call two witnesses (Empire's President and Empire's Manager of Strategic Planning) at the "true-up" portion of the hearing in November 2006. It is not disputed that Industrials had the full and fair opportunity to cross-examine these witnesses at the prior evidentiary hearing in this case in September 2006. Prior to the "true-up" portion of the hearing, Industrials had sought and obtained subpoenas compelling the presence of both of these witnesses at the "true-up" hearing. Empire moved to quash the subpoenas and the Commission issued its Order Quashing Subpoenas on November 16, 2006, based on its finding that "no purpose will be served by requiring Mr. Tarter or Gipson[5] to attend the [true-up] proceedings."

---

5. The two witnesses in question.

Industrials fail to cite any persuasive authority to support the proposition that they were denied a fair hearing because the Commission prohibited them from presenting this testimony at the "true-up" hearing. Industrials rely heavily on their assumption they have an unfettered and unlimited "right" to subpoena witnesses, which they argue "is guaranteed under Section 536.070." Section 536.070(2) contains no such "guarantee" but, instead, states the following:

In any contested case:

. . . .

(2) Each party shall have the right to call and examine witnesses, to introduce exhibits, to cross-examine opposing witnesses on any matter relevant to the issues even though that matter was not the subject of the direct examination, to impeach any witness regardless of which party first called him to testify, and to rebut the evidence against him.

We agree that this statute confers the general right to call and cross-examine witnesses at a contested hearing, but this right is not without boundaries or limitations. Industrials ignore other portions of the statute that expressly limit this right. Section 536.070(8) provides that "[i]rrelevant and unduly *repetitious* evidence *shall* be excluded." (Emphasis added.) "This court has found [in the specific context of the Public Service Commission hearings], pursuant to these statutory provisions, that the Commission is not required to hear evidence that is irrelevant and repetitious." *State ex rel. Praxair, Inc. v. Mo. Pub. Serv. Comm'n*, —— S.W.3d ——, —— (Mo.App. W.D.2010); *see also Envtl. Utils., LLC v. Pub. Serv. Comm'n*, 219 S.W.3d 256, 265 (Mo.App. W.D.2007) ("The Commission, having conclusively determined the issue in a prior proceeding, was not required to hold an evidentiary hearing

on matters irrelevant and repetitious" pursuant to Section 536.070(7)–(8)).

The question becomes whether the Commission erred in quashing the subpoenas in this case. We conclude that no such error occurred. In articulating why it wished to subpoena these witnesses who had both previously testified before the Commission in this matter, Industrials admit that the evidence would in fact be repetitious:

In the chief evidentiary hearing, Empire presented the testimony of Bill Gipson and Todd Tarter on the issue of calculation of regulatory amortizations and fuel expense. In the true-up proceeding, however, Empire presented the testimony of Scott Keith on the *same issues*. In an effort to show that the methodology used by Mr. Keith was not consistent with the previous positions of Empire, the Appellants sough to subpoena, as rebuttal witnesses, the testimony of both Mr. Gibson and Mr. Tarter.

(Emphasis added.)

Here, the Commission undisputedly had already heard evidence pertaining to the calculation of regulatory amortizations and fuel expense by both Bill Gipson and Todd Tarter, and thus having them testify to the same subjects yet again would inherently be repetitious. We understand Industrials' argument that Scott Keith allegedly testified inconsistently at a later hearing, yet we fail to ascertain how this fact alone would allow Industrials an unlimited right to re-call witnesses that they have had a full and fair opportunity to cross-examine regarding this very subject, in the very same matter before this very same tribunal. If Industrials wished "to show that the methodology used by Mr. Keith was not consistent with the previous positions of Empire," they could have done so without putting on duplicative testimony, thereby unnecessarily enlarging already lengthy proceedings. We cannot say that

the Commission erred in concluding that "no purpose will be served by requiring Mr. Tarter or Gipson to attend the [true-up] proceedings."

To support its argument that it had an unfettered right pursuant to Section 536.070 to re-call Mr. Tarter and Mr. Gipson at the hearing as it pertained to the same issues, Industrials rely solely on, *State ex rel. Fischer v. Public Service Commission*, 645 S.W.2d 39 (Mo.App. W.D.1982). In *Fischer*, this Court reviewed the Commission's ruling that "prior to the hearing that the only issue it would consider was whether or not the stipulation and agreement would be accepted or rejected, and a full and contested hearing would be held only in the event that the Commission rejected the agreement." *Id.* at 41. Because the Commission employed a "limited hearing procedure," we reversed and remanded the matter and found the following:

> Although Public Counsel was allowed to present his rate design proposal and to cross-examine the opposing witnesses, the Commission had previously decided that the only issue it would consider was whether or not to approve the stipulation and agreement. In light of this decision, the hearing afforded Public Counsel was not meaningful, in that the Commission was precluded from approving anything but the stipulated rate design in the course of the hearing in question. The question properly before the Commission was what rate design to adopt, rather than whether or not to adopt one particular proposal. Thus, the hearing procedure adopted in this case was a violation of the due process which should be accorded to Public Counsel in his capacity as the representative of the public.

*Id.* at 43.

But the instant hearing was not so truncated, thus making *Fischer* inapposite to our analysis. Here, an extensive hearing was held lasting more than one week. Industrials do not contend that they were prevented from presenting evidence as it pertained to *any* specific issue that they wished to dispute before the Commission. While they contend that the hearings before the Commission constituted "limited hearings," Industrials fail to articulate how the hearings before the Commission were limited in any substantive manner. Industrials merely contend that because they were not allowed to re-call two witnesses to re-explore an evidentiary issue already well-documented in the record before the Commission, that this somehow gives them a right to a new hearing on appeal. We disagree.

We find that our recent holding in *State ex rel. Praxair, Inc.* is actually more illuminating to resolving the instant issue. In *Praxair*, the Commission heard a dispute regarding a merger of utilities, and after the hearing, the Commission approved the merger in question. *Praxair*, —— S.W.3d at ——. During the hearings, the utilities in question filed a motion to limit the scope of the hearing to exclude evidence of their corporate codes of conduct and gift and gratuities policies, because it argued the evidence was irrelevant to whether the merger would be "detrimental to the public" (the standard for deciding if the merger should be approved). *Id.* at ——. The Commission granted the motion to limit the scope of the hearing and an appeal was taken to this Court challenging the merger, during which time it was alleged that "the Commission's refusal to allow an offer of proof as to the Utilities' policies on corporate conduct and gifts and gratuities was unlawful, unreasonable, and an abuse of discretion." *Id.* at ——. In rejecting this argument on appeal, we held the following:

Missouri courts have long recognized that the Public Service Commission Law delegates a large area of discretion to the Commission and many of its decisions necessarily rest largely in the exercise of sound judgment. Where the Commission's decision rests on the exercise of regulatory discretion, particularly on issues within its expertise, we will not substitute our judgment for the Commission's, nor will we re-weigh the evidence. It was a matter for the Commission's discretion whether the proposed evidence about gift and gratuities policies and corporate codes of conduct was relevant to the "detrimental to the public" analysis.

As a reviewing court, we do not *automatically* reverse the ruling of an administrative agency or tribunal merely because an offer of proof was rejected. In fact, we cannot know that the proffered evidence was relevant unless the appellant is able to demonstrate the relevance. If the Commission rejects an offer of proof, the Commission risks the possibility that, on judicial review, this court will determine that the evidence was not "wholly irrelevant." But it is up to the proponents of the evidence to demonstrate to us on appeal that the evidence would in fact have been directly pertinent to the matter at issue. This court cannot *assume* that the gift and gratuity policies of KCPL and Great Plains are or would be so detrimental to the public interest that the merger should not be allowed.

The Appellants completely fail to make the necessary showing. The Appellants seem to expect us to reverse simply because they were not permitted to make their offer of proof. That is not the law.

*Id.* at —— (citations and quotations omitted).

Industrials presume that this Court should reverse and remand this matter simply because they were not allowed to re-call two witnesses to testify regarding the issue of calculating regulatory amortizations because they would have arguably demonstrated "that the methodology used by [a subsequent witness] was not consistent with the previous positions of Empire." But on appeal, Industrials have failed to even demonstrate that re-calling these two witnesses would have in fact provided any new information not previously brought forth in the first hearing. Ultimately, the question in *Praxair* at least involved a colorable issue wherein the Commission categorically prohibited even a proffer of evidence regarding an arguably relevant issue of law; here, however, the Commission merely prevented the presentation of "repetitious" evidence, which was properly excluded pursuant to Section 536.070(7)–(8).

Although not mentioned by Industrials anywhere in their brief, we believe it is worth noting that Section 536.077 is a separate statutory provision that expressly provides that, in contested cases, parties have the right to use the power of subpoena to compel the attendance of witnesses at hearings. *See* Section 536.077. Accordingly, we wish to make clear that our holding does not somehow blindly trump this statutory right pursuant to Section 536.077 because it clearly applies in the context of Public Service Commission cases. *See generally State ex rel. Young v. City of St. Charles*, 977 S.W.2d 503, 504 (Mo. banc 1998). Rather, for the reasons already explained at length, we believe that Section 536.077 expressly provides that subpoenas can be quashed upon the showing of good cause, as was shown in this case. *See* Section 536.077.

For all of the aforementioned reasons, we conclude that Industrials have failed to

meet their burden in demonstrating that the Commission's order, which "is presumed to be valid," was not " 'based on lawful procedure or a fair trial.' " *Hurricane Deck Holding Co.*, 289 S.W.3d at 263 (quoting *State ex rel. Pub. Counsel v. Pub. Serv. Comm'n*, 274 S.W.3d 569, 573 (Mo. App. W.D.2009)).

Point One is denied.

In Point Two, both Industrials and OPC argue that the Commission erred in authorizing a return on equity of 10.9% because its decision was arbitrary and capricious and also because the decision was not supported by substantial evidence. Missouri law is clear that the arguments set forth in this Point are not a cognizable basis for relief on appeal.

Section 393.270.4, governs, in part, the Commission's authority to fix utility rates, and states the following:

> In determining the price to be charged for gas, electricity, or water the commission may consider all facts which in its judgment have any bearing upon a proper determination of the question although not set forth in the complaint and not within the allegations contained therein, with due regard, among other things, to a reasonable average return upon capital actually expended and to the necessity of making reservations out of income for surplus and contingencies.

Because Empire is a public-traded utility, the Commission focused on "Empire's average return on common equity ("ROE")" in order to determine Empire's reasonable average return pursuant to the statute's requirement. The Commission found, in concluding that 10.9% was the appropriate ROE:

> In light of the comparable companies' average ROE at or near 10.9%, the national average of ROE of 10.5%, and the perceived risks associated with invest-

ment in Empire (including the downgrade of Empire's credit rating to the lowest investment grade after this case was filed), the Commission concludes that 10.9% is the reasonable and appropriate ROE for Empire.

■ Appellants challenge the specific methodology used by the Commission to reach its ultimate conclusion. Missouri courts are clear that the Commission is not bound to any set methodology in ensuring a just and reasonable return in setting rates. This Court outlined the following governing principles in *State ex rel. Office of the Public Counsel v. Public Service Commission*, 938 S.W.2d 339, 344 (Mo. App. W.D.1997):

> The Commission has considerable discretion in rate setting due to the inherent complexities involved in the rate setting process. *State ex rel. Associated Natural Gas Co. v. Public Serv. Comm'n*, 706 S.W.2d 870 (Mo.App.1985). It is not the theory or methodology, but the impact of the rate order which counts. *State ex rel. Missouri Water Co. v. Public Serv. Comm'n*, 308 S.W.2d 704, 714 (Mo.1957). Missouri courts do not set utility rates. *State ex rel. GTE North, Inc. v. Missouri Pub. Serv. Comm'n*, 835 S.W.2d 356, 361 (Mo.App. 1992). *"If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end." Associated Natural Gas*, 706 S.W.2d at 873 (quoting *Federal Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591, 602–03, 64 S.Ct. 281, 287–88, 88 L.Ed. 333 (1944)). Where ratemaking is at issue, determinations by the Commission are favored by a presumption of validity.

(Emphasis added.)

■ Industrials and OPC do not quarrel with the proposition that Missouri law holds that the Commission has vast discre-

tion in setting rates; instead, they urge that a better method of reviewing the Commission's ruling is set forth by the federal courts: "Missouri appellate courts have not provided definition to such a standard [but][t]hat said, however, the federal courts, utilizing the same standard of review, have offered a great deal of insight." Because Appellants have not established that this federal case law is binding on this Court because of some sort of constitutional guarantee, we, of course, instead choose to follow Missouri's well-defined case law in the specific context of the Missouri Public Service Commission.

Appellants challenge the specific means the Commission used to reach its ultimate conclusion that a 10.9% ROE was appropriate. OPC contends that the Commission used a "zone of reasonableness" method to reach this result, while Industrials argue that the Commission used a "constant growth DCF analysis." [6] The Appellants argue that because the Commission failed to use the same methodology in this case as it has in *other* analogous cases that have previously come before the Commission, this somehow illustrates that the instant order is arbitrary and capricious.

■ The PSC "is not bound by *stare decisis* " based on prior administrative decisions, so long as its current decision is not otherwise unreasonable or unlawful. *See State ex rel. AG Processing, Inc. v. Pub. Serv. Comm'n,* 120 S.W.3d 732, 736

(Mo. banc 2003). "Courts are not concerned with alleged inconsistency between current and prior decisions of an administrative agency" because "[i]t is the impact of the rate order which counts; the methodology is not significant." *State ex rel. GTE N., Inc. v. Mo. Pub. Serv. Comm'n,* 835 S.W.2d 356, 371 (Mo.App. W.D.1992) (citation and quotation omitted).

For example, Industrials argue that "[i]n at least three cases decided in the nine months preceding this decision, the Commission found that the results of the constant growth DCF should be 'excluded' or 'discarded.'" OPC makes a similar argument that "[t]he Commission's adoption of a zone of reasonableness of 9.55% to 11.55% in the case on appeal here was arbitrary and capricious and unreasonable in that—on the very same day—it issued an order in Case No. ER–2006–0314 establishing a 'zone of reasonableness' of 9.37 to 11.37%." Because these arguments, grounded on the theory of *stare decisis*, are not a viable basis for relief for appealing the Commission's order, we reject them on their face.[7]

■ Finally, OPC argues that the Commission's order in this regard should be reversed because it is "not supported by the record." Specifically, OPC argues that "[n]o expert testified that the national average of returns awarded for electric utilities should be used as the basis for a

6. Pursuant to our standard of review, we believe it is less important to affix a label to the methodology used by the Commission to set the rate, as opposed to simply determining whether its ultimate conclusion was proper as a matter of law. *See State ex rel. Office of the Pub. Counsel,* 938 S.W.2d at 344.

7. Indeed, OPC's *stare decisis* argument also illustrates why such an argument is not very illuminating in determining if the Commission's order was arbitrary or capricious. Specifically, the OPC insinuates that because

in Case No. ER–2006–0314 the Commission found that the zone of reasonableness was 9.37% to 11.37%, that this zone should remain *static for every case.* But because OPC tells this Court *nothing* about Case No. ER–2006–0314, we cannot even begin to determine whether it is an analogous case to the instant matter for countless different reasons, including to whom the utility is being provided, for what time frame, or how the company that is providing that utility is faring in the marketplace.

'zone of reasonableness.'" But we have previously rejected a similar argument "that the commission erred in using the national, instead of the regional, average rate of return on equity as its baseline." *State ex rel. Pub. Counsel v. Pub. Serv. Comm'n,* 274 S.W.3d 569, 574 (Mo.App. W.D.2009). OPC cites *no* authority to support the proposition that each finding and conclusion by the Commission must somehow be supported by expert testimony, and, in fact, such a proposition would contradict the well-established principle that "Commission has considerable discretion in rate setting due to the inherent complexities involved in the rate setting process." *State ex rel. Office of the Pub. Counsel,* 938 S.W.2d at 344.

 OPC makes other, similar arguments, that attempt to attack the Commission's specific methodology in arriving at the rate in question, and OPC even goes so far as to argue that "[t]here is simply nothing in the record to establish that the 'zone of reasonableness' is itself reasonable." But this Court has expressly held that "[t]he United State's Supreme Court has instructed the judiciary not to interfere when the commission's rate is within the zone of reasonableness." *State ex rel. Pub. Counsel,* 274 S.W.3d at 574 (citing *In re Permian Basin Area Rate Cases,* 390 U.S. 747, 767, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968)). These arguments ignore the fact that on appeal the onus is on *OPC* to demonstrate that the Commission's order is somehow unreasonable. "Where ratemaking is at issue, determinations by the Commission are favored by a presumption of validity." *State ex rel. Office of the Pub. Counsel,* 938 S.W.2d at 344. When OPC argues that "[n]o expert testified that using an entire calendar year is more accurate that using a shorter period of more recent data, or three years of data, or any other variation of recent national figures,"

it is a critique without substance or meaning, in that it does not specifically address how the Commission's order is in error. Were OPC to argue that, for example, the Commission *must* use three years of data in this analysis and then cite some supporting authority for that position, then this would be the type of detailed argument that this Court could then address in a concrete fashion. But because OPC presents no such concrete evidence, removed from mere hypothetical, we must deny this Point.

Point Two is denied.

In Point Three, Industrials argue that "the Commission erred in its decision to adopt Empire's method for calculating fuel and purchased power expense because such a decision is not supported by adequate findings of fact in that the Commission's rationale is entirely conclusory in nature."

In order to set Empire's rate, the Commission determined the appropriate level of fuel and purchased power, which is significant because there was evidence that this constituted almost fifty percent of Empire's total expenses during the year in question. After outlining the relevant evidence that was presented before the Commission on this issue at the hearing, the Commission stated that "[h]aving considered the prices and methodologies of the Industrials, OPC, Staff and Empire in developing their positions, the Commission concludes that Empire's is reasonable and most likely to accurately predict its annual fuel costs."

 Industrials contend that the Commission erred because its decision rested solely "on the conclusory finding that 'Empire has a greater familiarity with the intricacies of its system and facilities.'" While this was *one* of the Commission's findings that led to its ultimate conclusion,

■■■■■■■■■■■■■■■

Industrials entirely disregard the Commission's other critical findings:

> We do not find the Industrials' position on fuel and purchased power expense to be credible. Although there is no way to accurately predict what fuel prices will do, the fuel prices used by the Industrials do not appear to be consistently derived from actual, spot or future prices, nor do they appear to be appropriately normalized for weather.
>
> Having eliminated the position of the Industrials as not credible, the highest model run for the Missouri jurisdiction is only $3 million from the lowest. The remaining positions are Empire, which ran its own model; the OPC, which ran Empire's fuel model but substituted a different natural gas price, and the Staff, which ran its own fuel model. Having reviewed the differences in the mode inputs between the Staff and Empire, we find Empire's inputs to be more credible than the Staff's.

■■■ We reject Industrials' argument that the Commission's order was "completely conclusory" and based "solely" on Empire's "purported 'greater familiarity'" and that, therefore, "the Commission has abdicated its regulatory oversight." Industrials completely disregard the various credibility findings of the Commission as it pertained to the specific evidence adduced as to the appropriate level of fuel and purchased power, which were obviously critical to the Commission's ultimate conclusion. "The determination of witness credibility is left to the Commission, which is free to believe none, part, or all of the testimony." *See generally State ex rel.*

*Pub. Counsel v. Mo. Pub. Serv. Comm'n,* 289 S.W.3d 240, 247 (Mo.App. W.D.2009) (citation and quotation omitted). Because the Commission was free to weigh the credibility of the evidence, Industrials have failed to demonstrate that the Commission somehow erred.

■■■ We also reject this Point because Industrials have failed to even attempt to demonstrate how the Commission's order is contrary to the weight of the evidence. "It is only where a Commission order is clearly contrary to the overwhelming weight of the evidence that we may set it aside." *Id.* (citation and quotation omitted). Industrials do not even mention the specific evidence that was presented before the Commission as it pertained to fuel and purchased power expense and, instead, simply take issue with the ultimate conclusion of the Commission. But without making *some* sort of specific demonstration that the Order is invalid based on the evidence before the Commission, Industrials cannot expect relief from this Court because "[i]n reviewing the Commission's order, we presume that the order is valid and the party attacking it has the burden of proving its invalidity." *Id.* at 246. Simply put, Industrials have failed to meet this burden on appeal for all of the aforementioned reasons.[8]

Point Three is denied.

In Point Four, Industrials and OPC argue that the Commission erred in terminating Empire's Interim Energy Charge, although they advance distinct theories as to why specifically the Commission so erred.

---

8. We wish to address Industrials' argument that Section 393.150.2 places "a burden on the utility to show the reasonableness of a proposed rate." Section 393.150.2 states, in part, that "[a]t any hearing involving a rate sought to be increased, the burden of proof to show that the increased rate or proposed rate is just and reasonable shall be upon the ... electrical corporation." While this may be an accurate recitation of the burden of proof before the *Commission,* Industrials' instant argument ignores that they must carry the burden on *appeal,* as outlined above, in order to demonstrate that they are entitled to relief.

To understand the genesis of this dispute on appeal, we must turn to the rate increase that preceded the instant one under review. In 2004, Empire sought a rate increase in case number ER–2004–0570, which is *not* the subject of the instant appeal. In partial settlement of the disputed issues in that previous case, some of the interested parties entered into a Nonunanimous Stipulation and Agreement Regarding Fuel and Purchased Power Expense ("2005 Stipulation"), which was subsequently approved by the Commission on March 10, 2005.

Of importance to the instant dispute, the "2005 Stipulation purported to resolve the fuel and purchased power expense at issue in ER–2004–0570 by agreement to a certain level of recovery of those expenses in Empire's permanent rates, not subject to refund, and recovery of an additional amount on an interim basis, subject to true-up and refund, referred to as the Interim Energy Charge ("IEC")," which "was to be in effect for three years."

In the instant Order setting Empire's rate that is in dispute in the instant appeal, the Commission made the following findings and conclusions:

> The Commission finds that the 2005 Stipulation does not allow sufficient recovery of Empire's prudently incurred fuel and purchased power costs by $26.8 million annually ... The Commission concludes that it must determine just and reasonable rates based on what it deems to be Empire's prudently incurred costs. To the extent that the 2005 Stipulation limits recovery of Empire's prudently incurred fuel and purchased power expenses, then it attempts to limit one of the 'factors which determine rates' and is overcome by the Commis-

sion's exercise of the police power granted to it. Moreover, the Commission concludes that its prior approval of the 2005 Stipulation in no way *estops* or hampers it in its determination of just and reasonable rates. The Commission concludes that Empire may recover the prudently incurred fuel and purchased power costs at the level determined above in base rates.

 Industrials argue that the above findings were in error because the "IEC is a performance based plan" and "Section 386.266.8 precludes the Commission from prematurely terminating a performance based plan." Section 386.266.8 states, in relevant part, that "[i]n the event the commission lawfully approves an incentive-or performance-based plan, such plan shall be binding on the commission for the entire term of the plan."

Because "the Interim Energy Charge constituted a 'lawfully approved incentive or performance based plan,'" Industrials contend that the IEC "was binding on the commission for the entire term of the plan" and that, therefore, "the Commission's action in regards to the premature termination of the IEC is unlawful and should be reversed."

Assuming *arguendo* that the IEC was "an incentive-or performance-based plan" pursuant to Section 386.266.8,[9] we still must reject Industrials' argument. Industrials' argument fails to account for, or even mention, the language in Section 386.266.10, which states the following:

> Nothing contained in this section shall be construed as affecting any existing adjustment mechanisms, rate schedule, tariff, *incentive plan,* or other ratemak-

---

9. Because it is not essential to our disposition on appeal, we expressly refrain from ruling on the substantive merits of this specific issue.

ing mechanism *currently approved and in effect.*

(Emphasis added.)

Section 386.266 did not become law until January 1, 2006, which is well after the IEC was entered into by the parties and approved by the Commission in 2005.

When interpreting the relevant language in Section 386.266, "the primary rule of statutory construction requires this Court to ascertain the intent of the legislature by considering the plain and ordinary meaning of the words used in the statute." *Courtney v. Roggy,* 302 S.W.3d 141, 146 (Mo.App. W.D.2009) (citation and quotation omitted). "Each word, clause, sentence and section of a statute should be given meaning." *Id.* (citation and quotation omitted).

Section 386.266.8 could not "bind" the Commission to the IEC "for the entire term of the plan" even assuming it is an "incentive plan," in light of the fact that the IEC was "approved and in effect" before Section 386.266 became law. The express and unambiguous language of Section 386.266.10 provides that "[n]othing contained in this section," including Section 386.266.8, "shall be construed as affecting any existing ... incentive plan." Therefore, we must reject Industrials' argument, which is grounded solely in the language of Section 386.266.8, because it would cause us to ignore the express language of Section 386.266.10. *Courtney,* 302 S.W.3d at 146.

OPC argues that the "Commission erred in terminating the [IEC] because the decision is an abuse of the police power in that the record in this case does not demon-strate that the interest of the state in protecting the public interest through the exercise of the police power outweighs the interest of the public counsel in the continuation of the settlement agreement which established the [IEC]."

Here, it is not disputed that the IEC expressly provided that the Commission had the authority to terminate the IEC in the following language: "The IEC tariff or rate schedule will expire no later than 12:01 a.m. on the date that is three years after the original effective date ... *unless earlier terminated by order of the Commission.*" (Emphasis added.) [10]

The gravamen of OPC's argument on appeal is that the "police power is inherently tied to the public welfare, and the Commission found no impact on the public welfare." We disagree. The Commission made extensive findings of fact and conclusions of law that it was utilizing its police powers in terminating the IEC in order to protect the general welfare of the public:

The Commission has the duty to ensure that rates are just and reasonable in a manner that will allow a utility to adequately recover its costs. The Commission cannot set rates at a level that could place a utility in serious financial jeopardy. Further, without adequate revenues, a utility cannot ensure safe and adequate service for its customers. The existing IEC agreement has and will continue to create a significant under-recovery of cost for Empire because of the volatility of the natural gas prices that was unforeseen at the time the IEC agreement was reached. This Commission cannot abrogate its duty to both the utility and its customers simply because

---

10. Even without this contractual language, the Missouri Supreme Court has long held that the Commission is not bound by contractual terms if they prevent the Commission from ensuring the safety of the ratepayers.

*State ex rel. Kansas City Pub. Serv. Co. v. Latshaw,* 325 Mo. 909, 30 S.W.2d 105, 107–108 (1930). See also *State ex rel. Capital City Water Co. v. Mo. Pub. Serv. Comm'n,* 850 S.W.2d 903, 911 (Mo.App. W.D.1993).

some of the parties have previously reached a Stipulation and Agreement that addresses the issue of fuel costs to the serious detriment of the utility. Given our statutory mandate, the Commission must ignore the Stipulation and Agreement as it pertains to fuel cost recovery, and set rates that are just and reasonable and that may better ensure Empire's solvency and its ability to provide safe and adequate service to its customers.... The 2005 Stipulation does not allow sufficient recovery of Empire's prudently incurred fuel and purchased power costs by $26.8 million annually.

OPC further attacks the above findings and conclusions on the basis that they are insufficient to demonstrate that the Commission was warranted in exercising its police powers in order to terminate the IEC. For example, OPC argues that "[i]f there was a supported finding that Empire would become insolvent or be unable to provide safe and adequate service if the Commission refused to abrogate the settlement agreement, then the Commission could validly use its police power to abrogate the agreement, but such was not the case here."

OPC's argument simply ignores the very *specific* finding by the Commission that the IEC "does not allow sufficient recovery of Empire's prudently incurred fuel and purchased power costs by $26.8 million *annually*." Pursuant to our standard of review, it is incumbent upon OPC to demonstrate on appeal that there was contrary evidence before the Commission that this type of loss was somehow sustainable for a publicly traded corporation. OPC points to no such evidence on appeal but merely makes arguments that are not supported by any authority: "The Commission found, at best a 'serious detriment' to Empire, and a serious detriment is a far cry from

serious financial jeopardy." But OPC fails to articulate why the undisputed evidence in question could not *also* have caused "serious financial jeopardy" to Empire or, perhaps more importantly, that a "serious financial jeopardy" to a utility is a legal pre-requisite under Missouri law for the Commission to so act in this regard.

We do not believe that the Commission was constrained to wait until Empire was on the brink of literal financial collapse before exercising its authority to ensure the welfare of the public by protecting the viability of the utility. For example, the Commission found that "Empire's corporate credit rating by Standard and Poor's was downgraded, on May 16, 2006 from BBB to BBB–, the lowest investment grade rating" and that prior to February 13, 2006, Empire was on "a negative credit watch." We believe that this is just further evidence to support the above findings and conclusions.

Ultimately, because OPC concedes that the Commission has a duty to ensure the viability of public utilities to *protect the public*, we must reject its argument on appeal that raising rates is inherently contrary to the safety and welfare of the public.

Point Four is denied.

In Point Five, OPC argues that the "Commission erred in delaying ruling upon Public Counsel's application for rehearing because the decision constitutes an abuse of discretion in that the Commission took an unreasonably long time to rule." We disagree.

To support its argument that the Commission has some sort of strict, time based deadline that the Commission is required by law to meet in issuing its orders in this regard, OPC relies on our holding in *State ex rel. AG Processing, Inc. v. Public Service Commission*, 276 S.W.3d 303, 312–13

(Mo.App. W.D.2008). OPC asserts that in *State ex rel. AG Processing, Inc.*, this Court "clearly implies that thirty-four days may be 'unduly and unreasonably long'" and that we "indicate[d] that the proper interpretation of this lack of a specific statutory timeframe is that the Commission must 'proceed with reasonable dispatch in the applicable circumstances.'" A closer inspection of *State ex rel. AG Processing, Inc.* reveals that we did not outline such a broad holding:

> With that in mind, it seems somewhat odd that the General Assembly specified no deadline for the PSC's ruling on applications for rehearing. We see no reason to believe that the General Assembly was casual in attitude about allowing new rates to be effective for an extended period of time before an affected party could seek judicial review of the decision. *Perhaps* the lack of a deadline for ruling on applications for rehearing was a legislative oversight; or *perhaps* the legislature chose not to arbitrarily bind the discretion of the members of the PSC in its effort to appropriately balance all of the interests affected, and to proceed with reasonable dispatch in the applicable circumstances. The legislature is aware that the courts remain available for writ purposes where there is a clear violation of statutory duty through an abuse of discretion.
>
> . . . .
>
> There is no showing here that the PSC has developed a pattern or practice of trying to evade short-term judicial review of its rulings. Nor is there any argument here that its decision to quickly implement the new rates (and to deny a stay pending consideration of rehearing) was an abuse of discretion. . . . *Although the broad discretion granted the PSC as to the timing of its rulings may at times be a source of frustration to the various parties, we cannot say that the constitutional and statutory framework currently in existence has been shown to have the effect in this case of violating the Consumers' rights.*
>
> . . . . *The remedy the Consumers implicitly seek-a change in the statutory framework-is not for our determination on this record. It remains subject to the legislative judgment.*

*Id.* 312–13 (emphasis added) (citations omitted).

While in *State ex rel. AG Processing, Inc.* we did not categorically exclude the possibility that the Commission's failure to act at some juncture could be a basis for relief, the gravamen of our holding was that it was for the *legislature* to dictate such applicable parameters as opposed to the Court. *Id.* More importantly, it is unclear from OPC's brief what remedy it seeks, even assuming we were to agree that "the Commission took an unreasonably long time to rule."

In *State ex rel. AG Processing, Inc.*, the consumers in question were using this timeliness argument as a vehicle on appeal for a remand so that they could obtain judicial review of a ruling by the Commission because the circuit court dismissed their petition based on the Court's conclusion that it lacked jurisdiction because the Commission's order was not yet final. *Id.* at 305. There is no dispute that the Commission's order is final. Because this Court has addressed the substantive issues regarding the Commission's order, OPC's argument is unclear as to what, at this juncture, we should order the Commission to do *if* any such delay by the Commission were to constitute an "abuse of discretion" because the procedural posture is so distinct from that found in *State ex rel. AG Processing, Inc.*

While it is not essential to our disposition on appeal, we also note that the Com-

mission's timeframe in issuing its order cannot be characterized as "unreasonable." OPC focuses on the fact that "453 days passed between the time that Public Counsel filed an application for rehearing on December 29, 2006 and the time that the Commission ruled upon it on March 26, 2008." But this argument forgoes the fact that, for various reasons previously explained, certain issues pertaining to this case were litigated before the Missouri Supreme Court on two separate occasions, thus precluding the Commission from a speedy resolution of this matter.

Finally, OPC argues that "the Commission erred in *sua sponte* 'reconsidering' its December 21, 2006 Report and Order" because the Commission "has no statutory authority to ... re-issue its Report and Order with *minor changes* 15 months after it was first issued." Section 386.490.3 provides that once the Commission's order becomes effective, it "shall continue in force and effect for a period which may be designated therein *or until changed or abrogated by the commission.*" (Emphasis added.) Giving this statutory language its plain and ordinary meaning, it is clear that the Commission may amend its order on its own volition, when the changes in question are indisputably minor and inconsequential.

Point Five is denied.

### Conclusion

For all of the aforementioned reasons, the order of the Commission is hereby affirmed.

All concur.