

# In the
# Missouri Court of Appeals
## Western District

IN THE MATTER OF THE EMPIRE )
DISTRICT ELECTRIC COMPANY'S )
REQUEST FOR AUTHORITY TO ) WD84090 Consolidated with
FILE TARIFFS INCREASING ) WD84117
RATES FOR ELECTRIC SERVICE )
PROVIDED TO CUSTOMERS IN ITS ) OPINION FILED: July 27, 2021
MISSOURI SERVICE AREA, )
 )
        Respondent-Appellant, )
 )
OFFICE OF PUBLIC COUNSEL, )
 )
        Appellant-Respondent, )
 )
MIDWEST ENERGY CONSUMERS )
GROUP, )
 )
        Intervenor-Respondent, )
 )
v. )
 )
PUBLIC SERVICE COMMISSION, )
 )
        Respondent. )

### Appeal from the Public Service Commission

Before Division Four: Cynthia L. Martin, Chief Judge, Presiding, Gary D. Witt, Judge
and Edward R. Ardini, Jr., Judge

The Office of Public Counsel ("OPC") and The Empire District Electric Company ("Empire") each separately appealed from the Amended Report and Order ("Order") of the Public Service Commission ("Commission") in Empire's rate case, and those appeals have been consolidated herein. On appeal, the OPC claims that the Commission erred by including the historical financial impacts of a retired coal-fired generating plant in its projection for the future. Empire claims that the Commission erred in using an adjusted capital structure of Empire's indirect parent, which treated guarantees consistent with the treatment of debt. We affirm the Order of the Commission.

## Factual and Procedural Background

Empire is an electrical corporation and a public utility regulated by the Commission. Empire provides electric utility service for approximately 10,000 square miles in southwest Missouri and the adjacent corners of Kansas, Arkansas, and Oklahoma. Empire is also regulated by the Federal Energy Regulatory Commission ("FERC"). Empire has approximately 155,000 electric service customers in Missouri. Empire and Liberty Utilities are subsidiaries of Liberty Utilities Co. ("LUCo"), which is wholly owned by Algonquin Power & Utilities Company.

Appellant-Respondent the Office of Public Counsel ("OPC") represents the interests of the public before the Commission and on appeal of Commission orders and decisions. Section 386.710.[1]

---

[1] All statutory references are to RSMo. 2016, as updated by supplement, unless otherwise noted.

Empire filed tariffs designed to implement a general rate increase for electric service for its customers on August 19, 2019. As filed, the tariffs would have increased Empire's annual electric revenues by approximately $26.5 million or approximately 4.93%. The Commission suspended the tariffs until July 11, 2020, to allow for full rate case procedures. The Commission permitted intervention by the Missouri Department of Natural Resources--Division of Energy, Midwest Energy Consumers Group, Natural Resources Defense Council, Sierra Club, Renew Missouri Advocates, National Housing Trust, the Empire District Electric SERP Retirees, the Empire District Retired Members & Spouses Association, and the International Brotherhood of Electrical Workers Local Unions No. 1464, 1474.

The Commission established a test year encompassing the twelve months ending March 31, 2019, updated through September 30, 2019, with a true-up period to include known and measurable changes through January 31, 2020. A true-up period is the period where significant changes in a utility's cost of service that occur after the end of the update period but prior to the operation-of-law date are used to adjust the utility's cost of service.

Empire had a coal-fired electricity generating plant which was constructed in 1970 that it used to serve its customers, the Asbury plant ("Asbury"). Significant improvements were made to the plant over the years. In 2014, Empire made improvements to Asbury that extended Asbury's expected retirement date from 2030 to June 2035. Empire planned to close Asbury no later than June of 2020, however, to avoid significant additional investment that would have been required to comply with federal environmental regulations governing coal ash disposal. Empire anticipated that it would continue to use

3

some of the buildings and equipment located at Asbury for providing electric service in its planned wind farms, but as of May 6, 2020, it had still not determined which facilities would continue to operate. Empire engaged Black and Veatch engineering firm to develop a retirement plan for Asbury, but by May 6, 2020, the plan was not complete. Asbury last generated electrical power in December of 2019. Empire recorded its Asbury assets that it did not use elsewhere as being removed from service as of March 1, 2020, for accounting purposes. Retiring Asbury is expected to impact Empire's annual net income by at least five percent and to reduce Empire's labor costs and materials expenses to maintain Asbury.

On December 9, 2019, during the true-up period, OPC filed a motion requesting the Commission to modify the test year to include isolated adjustments to reflect the retirement of Asbury. OPC's request was to include isolated adjustments resulting from Empire moving the Asbury retirement date from no later than June 2020 to no later than March 2020. The Commission denied OPC's request, because March 2020 was outside the end of the true-up period, and the Commission determined that the Asbury retirement could be better addressed in a subsequent general rate case. The Commission ordered the parties to submit items for potential inclusion in an Accounting Authority Order, ("AAO") to capture the financial impacts of that retirement in Empire's next general rate case.

Local public hearings were held in Joplin, Branson, and Springfield. The Commission allowed for submission of the case on the record and admitted the written testimony of fifty-eight witnesses and 321 exhibits and took administrative notice of several matters. The Commission entered its final report and order. Empire and OPC each separately filed an application for rehearing of the amended report and order, both of which

4

the Commission denied. Empire and OPC each separately appealed and those cases were consolidated herein, with OPC and Empire each raising a single point on appeal.

## Standard of Review

Pursuant to section 386.510, our standard of review of the Commission's order is two-pronged: first, we determine whether the order is lawful, then we determine whether it is reasonable. *State ex rel. AG Processing, Inc. v. Pub. Serv. Comm'n*, 120 S.W.3d 732, 734 (Mo. banc 2003). The burden of proof is on the appellant to show that the Commission's order is either unlawful or unreasonable. *Id.* "The lawfulness of a Public Service Commission order depends on whether it issued under statutory authority." *State ex rel. Assoc. Nat. Gas Co. v. Pub. Serv. Comm'n*, 706 S.W.2d 870, 874 (Mo. App. W.D. 1985). All legal issues are reviewed *de novo. AG Processing, Inc.*, 120 S.W.3d at 734. "An order's reasonableness depends on whether it is supported by substantial and competent evidence on the whole record, and the appellate court considers the evidence together with all reasonable supporting inferences in the light most favorable to the Commission's order." *Id.* at 734-35. The Commission's order is presumed to be valid, and "if substantial evidence supports either of two conflicting factual conclusions, the Court is bound by the findings of the administrative tribunal." *Id.* at 735 (internal quotation omitted).

## OPC's Appeal

The OPC alleges that the Commission erred in including the historical financial impact of Empire owning and operating its Asbury plant in its projection of the future time period for which Empire's rates were being determined because Empire retired Asbury

5

when Asbury shut down on December 12, 2019, with no intention of operating Asbury after March 1, 2020.

When evaluating and designing new rates for a utility, the Commission is permitted to consider all material and relevant factors bearing on those rates. Section 393.270.4. The Commission uses an historical test year to determine just and reasonable future rates. *Off. of Pub. Couns. v. Evergy Mo. West, Inc.*, 609 S.W.3d 857, 860-61 (Mo. App. W.D. 2020). A true-up period following the test year "is designed to balance the historical data [from the test year] with known and measurable subsequent and future changes." *Id.* at 860 n.2. "Adjustments are also made for events occurring outside the test year." *State ex rel. GTE North, Inc. v. Mo. Pub. Serv. Comm'n*, 835 S.W.2d 356, 368 (Mo. App. W.D. 1992). "The criteria used to determine whether a post-year event should be included in the analysis of the test year is whether the proposed adjustment is (1) known and measurable, (2) promotes the proper relationship of investment, revenues and expenses, and (3) is representative of the conditions anticipated during the time the rates will be in effect." *Id.* (internal quotation omitted).

OPC sought to have the retirement of the Asbury plant included in the rates because the facility stopped generating power during the true-up period. But the Commission found that the effects of the Asbury retirement were "not known or measurable" at the time the rates were set. It noted that "OPC's witness was only able to provide an estimated range for O&M[2] expenses to be removed from rates, since, as he acknowledged, savings would

---

[2] O&M expenses are Operations and Management expenses.

6

be decreased by the O&M costs for the retirement process." The Commission found that "[s]ome of Asbury's facilities will be used as the base for O&M operations for Empire's planned wind farms and Empire is still evaluating if it will reuse other existing facilities. Although Asbury may not be generating electricity, some of its facilities may still be used and useful." It concluded that it was "impossible to accurately determine in this case the proper level of ongoing expense, including which Asbury plants will continue to have depreciation expense and which will not."

The OPC argues that the present case is similar to *State ex rel. Mo. Power & Light v. Pub. Serv. Comm'n*, 669 S.W.2d 941 (Mo. App. W.D. 1984), where tree-trimming expenses outside of the test year and the true-up period were still included in the rates by the Commission because the utility had had tree trimming expenses in the past and would reasonably be anticipated to have them again in the future. The OPC argues that Empire's retirement of Asbury was also known to the Commission, because it was becoming less economical to operate, and the Commission knew Empire had taken steps to exhaust its usable fuel for Asbury in anticipation of its retirement. But in *Mo. Power & Light*, the Commission was able to reasonably estimate the utility's tree trimming expenses based upon the average of what the utility had spent over the past five years. *Id.* at 945. In this case by contrast, the Commission found that there were simply too many unknowns regarding the future costs and savings relating to the Asbury retirement. Factual issues decided by the Commission are presumed correct if they are supported by the record. *State ex rel. Cap. City Water Co. v. Mo. Pub. Serv. Comm'n*, 850 S.W.2d 903, 909 (Mo. App. W.D. 1993).

7

Furthermore, the Commission did not completely disregard the Asbury retirement in its fashioning of rates. As with *Evergy Missouri West, Inc.*, 609 S.W.3d 857, the Commission is utilizing an accounting authority order ("AAO") to capture the cost savings Empire will experience due to the Asbury closing. "An AAO creates a balance-sheet account to defer extraordinary financial items for consideration in a utility's next general rate case, even though the items may occur outside the 'test year' utilized in the future rate case." *Id.* at 860. In the *Evergy* case, the utility was retiring a coal fired electric generating plant and it was the OPC who requested the AAO. *Id.* at 863. The court in *Evergy* found that the Commission, in establishing the AAO, had followed the guidance of 18 C.F.R. Part 101, General Instruction 7, and had not abused its considerable discretion in issuing the AAO because the retirement of the utility's plant was extraordinary, and even though it was foreseeable and anticipated, it had not been retired until after the true-up period of the rate case. *Id.* at 868. "Where the Commission's decision rests on the exercise of its regulatory discretion, particularly on issues within its expertise, we will not substitute our judgment for the Commission's, nor will we re-weigh the evidence." *State ex rel. Praxair, Inc. v. Pub. Serv. Comm'n*, 328 S.W.3d 329, 338 (Mo. App. W.D. 2010). We conclude that in this case as well, the Commission's use of the AAO is a lawful and reasonable way to capture the impact of the Asbury retirement as the costs and offsets become known and measurable so that they may be considered in Empire's next rate case.

OPC's point on appeal is denied.

**Empire's Appeal**

Empire also raises a single point on appeal. Empire argues that the Commission erred by refusing to use Empire's capital structure in formulating rates and instead used an adjusted capital structure that took guarantees into account, treating them as debt of Empire's parent company.

Section 393.270.4 relates to the Commission's authority to fix utility rates, providing:

> In determining the price to be charged for gas, electricity, or water, the commission may consider all facts which in its judgment have any bearing upon a proper determination of the question although not set forth in the complaint and not within the allegations contained therein, with due regard, among other things, to a reasonable average return upon capital actually expended and to the necessity of making reservations out of income for surplus and contingencies.

"Missouri courts are clear that the Commission is not bound to any set methodology in ensuring a just and reasonable return in setting rates." *Praxair*, 328 S.W.3d at 339.

> The Commission has considerable discretion in rate setting due to the inherent complexities involved in the rate setting process, *State ex rel. Associated Natural Gas Co. v. Public Serv. Comm'n*, 706 S.W.2d 870 (Mo. App. 1985). It is not the theory or the methodology, but the impact of the rate order which counts. *State ex rel. Missouri Water Co. v. Pub. Serv. Comm'n*, 308 S.W.2d 704, 714 (Mo. 1957). Missouri courts do not set utility rates. *State ex rel. GTE North, Inc. v. Mo. Pub. Serv. Comm'n*, 835 S.W.2d 356, 361 (Mo. App. 1992). *"If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end."* *Associated Natural Gas*, 706 S.W.2d at 873 (quoting *Federal Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591, 602-03, 64 S.Ct. 281, 287-88, L.Ed. 333 (1944)). Where ratemaking is at issue, determinations by the Commission are favored by a presumption of validity.

*State ex rel. Off. of the Pub. Couns. v. Pub. Serv. Comm'n*, 938 S.W.2d 339, 344 (Mo. App. W.D. 1997) (emphasis added.).

9

In the rate-making process, the fixing of just and reasonable rates, the Commission must balance the utility investor's interests with the consumer interests. *State ex rel. Assoc. Nat. Gas Co.*, 706 S.W.2d at 873. "It is important that there be enough revenue not only for operating expenses but also for the capital costs of the business. These include service on the debt and dividends on the stock. By that standard the return on the equity owner should be commensurate with returns on investments in other enterprises having corresponding risks." *Id.* (internal quotations omitted). But the rate of return should not be higher than necessary to achieve these goals, or the consumers will pay excessively, which would defeat the purpose of regulation. *Id.*

As part of consideration of these factors, the Commission must consider the utility's capital structure. *State ex rel. Mo. Gas Energy v. Pub. Serv. Comm'n*, 186 S.W.3d 376, 383 (Mo. App. W.D. 2005). "[A]ll else being equal, a capital structure that includes a low percentage of equity and a large percentage of debt will be less costly, resulting in a lower rate of return, and consequently a lower revenue requirement and lower rates to consumers." *Id.* (internal quotation omitted). "This is so because the cost of debt, or what it costs a corporation to borrow money and pay interest, is usually less than the cost of equity, i.e., issuing stock and paying dividends or a return on investment." *Id.*

When a utility is a subsidiary of another corporation, the Commission may consider both the capital structures of the parent and its subsidiaries. *See State ex rel. Off. of Pub. Couns. v. Pub. Serv. Comm'n*, 367 S.W.3d 91, 100 (Mo. App. S.D. 2012). Because determining the appropriate capital structure to use in rate-making is complex, the Commission turns to experts for guidance and must make difficult choices among

10

conflicting opinions. *Id.* In this case, Empire's expert recommended using its true-up capital structure, which consists of 53.07% equity and 46.93% long-term debt. Commission Staff recommended using Empire's capital structure of 52.43% equity and 47.57% long-term debt. OPC recommended using the parent company, LUCo's adjusted capital structure of 46% common equity and 54% long-term debt. The adjusted value comes from consideration of $395 million in off-balance-sheet debt that LUCo unconditionally guarantees for its affiliate corporations. The Commission determined that this off-balance-sheet debt should be considered when determining whether LUCo's or Empire's capital structure was more economical, and therefore should be used in calculating the rates. The Commission determined that because LUCo used the $395 million debt to record a higher equity balance on LUCo's balance sheet, this debt should be added to the debt on LUCo's balance sheet and subtracted from its equity balance. The Commission found the OPC's witness was more persuasive on this issue.

Empire now argues that the Commission was without authority to use an adjusted capital structure, but instead could only compare Empire's per-books capital structure to LUCo's per-books capital structure per the terms of a Merger Stipulation.[3] The law does not support this argument. The Commission must set rates that are just and reasonable. Section 393.130.1. The Commission has broad discretion in setting the rates. *Mo. Off. of Pub. Couns. v. Pub. Serv. Comm'n*, 293 S.W.3d 63, 84 (Mo. App. S.D. 2009). As such, it

___

[3] The Commission asserts that this argument was not preserved for appeal because it was not specifically part of Empire's motion for rehearing before the Commission. Empire's motion did object to the Commission's use of an adjusted capital structure of LUCo and off-balance sheet guarantees sufficiently raises the issue to preserve it for appeal.

may fashion a reasonable but hypothetical capital structure to determine rates if appropriate. *Id.* This is the case even where, as here, a contractual agreement may bind the parties to that contract, the parties cannot bind the Commission. "The Commission requires flexibility in exercising its ratemaking function to deal with changing and unforeseen circumstances. As a result, contracts between public utilities and their customers cannot limit the ratemaking authority of the Commission." *State ex rel. Cap. City Water Co.*, 850 S.W.2d at 911 (internal citation omitted). "Public utilities have no authority to enter into a contract which cannot be modified or revoked by the state." *Id. See also Praxair*, 328 S.W.3d at 344 n.10. The Commission did properly consider the Merger Stipulation. It then considered all of the expert testimony surrounding the effect of that Merger Stipulation and concluded that the adjusted Empire capital structure, which included LUCo's guarantees, best reflected the effective capital structure of the utility appropriate for calculation of rates. We conclude that this was within the Commission's discretion.

Moreover, "[i]t is not the theory or methodology, but the impact of the rate order which counts." *In the Matter of KCP&L v. Pub. Serv. Comm'n*, 509 S.W.3d 757, 765 (Mo. App. W.D. 2016) (internal quotation omitted). And "this Court has expressly held that '[t]he United States Supreme Court has instructed the judiciary not to interfere when the commission's rate [yields a return that] is within the zone of reasonableness.'" *Praxair*, 328 S.W.3d at 341. The zone of reasonableness test deems a return on equity presumptively reasonable if it is within a percentage point of the national average for

similar utilities.  *In the Matter of KCP&L*, 509 S.W.3d at 768.  Here, the return on equity awarded by the Commission was 9.25 percent, and the national average is 9.39 percent.

We find no error in the Commission's use of the adjusted capital structure in calculating a rate that was reasonable.  Empire's point on appeal is denied.

## Conclusion

For all of the above-stated reasons, we affirm the order of the Commission.

_____
Gary D. Witt, Judge

All concur